# THE PEOPLE *ex rel.* the Pekin, Lincoln and Decatur Railroad Company

*v.*

# THE BOARD OF SUPERVISORS OF LOGAN COUNTY.

1. MUNICIPAL AID TO RAILROAD—*authority to hold election.* The charter of a railroad company directed the authorities of a county to call an election when required so to do by the directors, to determine whether the county would subscribe to the capital stock of the company, and provided that if such first election should result against subscription, the board of supervisors should, on the petition of 200 legal voters of the county, order another vote to be taken at any subsequent general election. Both of these elections were held and resulted against subscription. The charter was subsequently amended so that the petition for an election should be presented to the county clerk instead of the board of supervisors, as was the case under the original charter, and the clerk was thereupon required to give notice of an election for a subscription, as provided for in the original charter. Under this latter act an election was held, resulting in a majority for subscription: *Held*, on *mandamus* to compel the subscription, that the election was authorized under the amendment to the charter.

2. SAME—*illegality and fraud in election.* In a proceeding by *mandamus* to compel the authorities of a county to subscribe and issue bonds to a railroad company, in pursuance of a vote of the people of the county, the return set up that the majority cast at the election in favor of subscription was more than made up of illegal votes; that a majority of the legal votes cast at such election was against subscription, and that the apparent majority in the county was entirely composed of illegal and fraudulent votes, cast by persons who were not entitled to vote, and that the railroad company, who were the relators, before entering into liabilities on the faith of such vote, had notice of the fact that a majority of the legal votes cast was against subscription: *Held*, on demurrer to the return, that the facts stated showed a defense to the proceeding; also that it was not necessary to go into detail and state the reasons why the votes were illegal and fraudulent.

3. SAME—*illegality in election.* It was also objected that the election on the question of subscription was illegal, for the reason that the judges of the election were not present at or acted in holding it in two townships. It appears that other persons acted as judges, and it was not shown that

any essential requirement of the statute was omitted in their selection and qualification: *Held*, that the objection was without force; that as the statute authorized the electors present, in case the judges failed to attend, to select others in their place, it would be presumed that the acting judges were legally selected, until shown that they were intruders acting without color of office, and even were this shown it seems very doubtful whether it could be allowed to disfranchise the voters of the townships.

4. SAME—*no registry used.* Where, at a county election to determine whether the county would subscribe a certain sum to the capital stock of a railroad company, the regular judges of election in two townships failed to attend and act, and those who were selected and acted in their places failed to use the registry of voters: *Held*, that the carelessness or fraud of the acting judges in not using the registry list could not be held to deprive the electors of their right of suffrage, and such neglect of duty alone did not invalidate the election, it not being shown that any illegal votes were cast in consequence thereof.

5. SAME—*estoppel to deny validity of election.* Where a majority of the votes cast at an election were found, on canvass, to be in favor of subscription, and on bill filed by citizens of the county to enjoin the county from making the proposed subscription, and to have the election declared void on the ground of fraud and illegal votes, and because a majority of the legal votes cast were against subscription, the board of supervisors answered such bill through its solicitors, traversing and denying all fraudulent and illegal voting at the election, and averring that a majority of the legal votes were in favor of the subscription, and that the board intended to make the subscription and issue bonds therefor: *Held*, on *mandamus* to compel the subscription, that the statements in the answer, not being sworn to, could not be held to be an estoppel and conclusion upon the county.

6. SAME—*power of board of supervisors to bind county.* A board of supervisors, as a general rule, subject it may be to some exceptions, can only bind the county within and to the limit of their powers. They can not bind their county by subscription or other admission to issue bonds, unless authorized by law. And if there was fraud and illegality in the election resulting in a vote for subscription, the board of supervisors have no power to validate such election by their acts and admissions, as a general rule.

7. SAME—*admissions of board of supervisors.* The board of supervisors have no power to subscribe on behalf of their county to the capital stock of a railroad company, except it is conferred by a vote of a majority of the citizens of the county, legally qualified to vote at an election held substantially in conformity to law. And where it is admitted by the pleadings that there was not a majority of the legal votes cast at the election in favor of subscription, the board of supervisors can neither make

a valid subscription, nor make statements, or pass resolutions to bind their county.

8. SAME—*laches—estoppel to question election.* After the canvass of the votes of a county election on the question of subscription to a railroad company, which was declared in favor of the subscription, the county authorities remained inactive until the company contracted for the construction of its road and the payment of the county bonds to the contractors, as a part of the consideration for building the road, and until the road had been completed on the faith of the proposed subscription. It was insisted that the county, by its *laches* in failing to have the election declared void before liabilities had been incurred on the faith of the vote, had lost all right to raise the question of fraud in the election by showing that the illegal votes cast in favor of the subscription were in excess of the majority claimed, and that the company, before incurring the liabilities, had notice of the facts: *Held,* that the county was not precluded from raising the question and making the defense. This case distinguished from *Prettyman* v. *Tazewell County,* 19 Ill. 406.

9. In such a case, the company knowing that there was not a majority of the legal votes cast in favor of subscription, they knew there was no legal power to make the subscription, or to issue the bonds. Knowing of the fraud before they incurred liability, they were as fully bound by it as if they had participated in its perpetration.

10. SAME—*defense against subscription.* On *mandamus* to compel the authorities of a county to make a subscription to a railroad company, in pursuance of a vote of a majority of the voters at an election, and to issue bonds in payment thereof, the return showed, as cause against the remedy sought, that the directors of the company, in contracting for the building of the road, gave to the contractors too large a sum: *Held,* that such fact was no defense; that the directors had the power to make contracts binding on stockholders, and that if they were fraudulently made, the shareholders might have them rescinded on bill in equity, or perhaps might have their remedy at law against the directors.

11. SAME—*leasing of road and giving stock.* So, the fact that the railroad company had incumbered its road, or given a lease thereon, so as to lessen the value of stock, or issued a large amount of stock to another company, the lessee of the road, affords no defense against an application to compel a county to subscribe a sum authorized by a vote of its citizens at a legal election. If the road was fraudulently mortgaged to raise more means than was necessary to build and equip it, and thus misapply a portion of the means obtained, a court of equity would afford ample relief. For any of the other wrongs of the directors the stockholders must seek the appropriate remedy.

12. MANDAMUS—*to compel county to subscribe to railroad.* Where the charter of a railroad company authorized a vote to be taken in a county

through which the road ran, on the question of subscribing to the capital stock of the company, and, in case of a majority of the legal votes being cast for subscription, imposed a duty upon the board of supervisors to make the subscription and issue the bonds of the county, the county can be compelled by *mandamus* to make the subscription if a majority of the legal votes at an election conducted according to law was in favor of subscription. In such case the board of supervisors have no discretion.

13. CONSTITUTIONAL LAW—*effect of new constitution on vote for corporate subscription.* Under the constitution of 1870 corporate subscriptions to the capital stock of railroad companies may be made, where the same has been authorized by a vote of the people of the municipality, before the adoption of the constitution.

14. SAME—*compelling corporate subscription.* It may be true that the legislature has no constitutional power to compel a municipal corporation to incur a debt against the will of its citizens, but where the corporation is merely authorized by vote to subscribe in aid of a railroad company, and a majority of its voters vote in favor of subscription, such will not be regarded as compelling the corporation to create a debt against the wishes of its citizens.

This proceeding was to obtain a *mandamus* against the board of supervisors of Logan county to compel the board to subscribe $100,000 to the capital stock of the relator. To the alternative writ the defendants made a return, to which the relator filed a demurrer. The facts necessary to an understanding of the case will be found in the opinion.

Messrs. FULLER & SMITH, and Messrs. GOUDY & CHANDLER, for the relator.

Messrs. HAY, GREENE & LITTLER, and Messrs. WELDON & BENJAMIN, for the respondents.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Relator filed a petition in this court asking for a writ of *mandamus* against respondents. The petition alleges that, under the charter of the railroad company authorizing an election to be held to determine whether the county would subscribe to the capital stock of the relator's company, an

election was held on the 27th day of April, 1869, in pursuance of its provisions, resulting in favor of subscription in the sum of $300,000; that the company had proceeded to build and had completed the road, and had demanded that the subscription be made and the bonds of the county for the first installment of $100,000 be issued, but the board of supervisors had refused to subscribe for the stock or to issue the bonds.

To this petition respondents filed a return, in which they set up as a defense that whilst by the canvass of the vote at the election it appears there was a majority of 246, in two of the organized townships of said county no judges of election were present or performed the duties required of them by law, and there was no registry of voters used by those who acted as judges; that the aggregate vote cast in those townships in favor of subscription was much larger than the declared majority in the entire county in favor of subscription; that the majority was more than made up of illegal votes cast at the election, and that the majority of the legal votes cast at the election was against subscription, and the apparent majority in the county was entirely composed of illegal and fraudulent votes, cast by persons who were not entitled to vote at the election, and that the relator, before entering into the contract for the construction of the road, had notice of the fraud in holding the election, and that the majority of the legal votes cast were against subscription.

The return further sets up as a defense that the railroad company, after the election, entered into a contract with certain persons for the construction of the road; that by the agreement relator was to give the contractors, in county and other municipal bonds, the amount of $8500 per mile, and in the bonds of the company, secured by a first mortgage, $15,000 per mile; that the bonds were worth from 80 to 90 per cent on the dollar; and to issue to the contractors stock in the company the further sum of $12,500 per mile as a payment for constructing the road.

Respondents further set up in their return that it was agreed this stock should be placed in the hands of a trustee, to be transferred to relator at the rate of $12,500 per mile as the road should be completed, but that not more than $200,-000 of such stock should be transferred by the trustee prior to the next regular meeting of the stockholders, and that the trustee was to vote the residue of the stock thus held by him for seven directors; three were to be chosen of the stockholders in Tazewell county; three the choice of the stockholders of Logan county, and one the choice of the stockholders of Macon county; and the stock thus transferred to the contractors was not to be subject to calls for payment in cash or bonds as other subscriptions for stock; and that $800,000 of stock was delivered in pursuance of the agreement; that afterwards relator leased the road to the Toledo, Wabash and Western Railway Company in perpetuity, when their charter only authorized them to lease the road for a term of years; that by the lease it was agreed that relator should issue bonds to the amount of $16,000 per mile of the road, and execute a mortgage thereon to secure the same; that the same were issued and placed in the hands of a trustee, in the city of New York, with power to sell the road if default in payment should be made by relator, and also to sell the bonds, under the direction of relator, to raise money to construct the road, and pay the balance to relator; and they bound the company never to issue more than $1,500,000 of stock, and to cause to be placed in the hands of the lessee, to be held as an escrow for the use of the owners, $800,000 of the capital stock of the company, to hold the same during the continuance of the lease, and cast the vote the owners of the stock would be entitled to in all elections of officers, and to place their transfer books in the hands of the lessee, whose transfer agent should be the transfer agent of relator. And the lessee was to furnish, equip and operate the road, and to keep the same in repair, and to pay relator not exceeding $1000 annually, to cover the expense of relator in conducting the business of

the company, and to pay the interest on the first mortgage bonds, and to accept this lease subject to the first mortgage; and, further, after deducting all expenses, to pay such portion of net surplus to relator as should be fixed by two disinterested railroad men; and the $800,000 should, at all times, be represented by two directors. That subsequently it was agreed by relator and the Toledo, Wabash and Western Railway Company that the bonds, mortgage and stock mentioned in the lease should be substituted for the first mortgage bonds and stock mentioned in the agreement with the contractors for the construction of the road. And it is alleged that the relator did not act in good faith in making the contract for the building of the road, and the $800,000 of stock was not issued *bona fide* as a part payment for constructing the road, nor did they act in good faith in issuing the stock to the Toledo, Wabash and Western Railway Company, but fraudulently intended to injure Logan county, and to gratuitously place the stock in other hands so as to overcome the power of control of whatever shares the county might thereafter hold. That two of the contractors for the construction of the road were directors of the road. To this return relator has filed a demurrer.

The first question arising on this record is, whether an election could be held in the county under the charter of the company, as amended by the act of 1869. The original charter authorized but two elections, both of which had been held before the amendment was adopted. The 11th section declared that, when required by the board of directors of the company, the board of supervisors should call a special election to determine whether the county would subscribe for stock. The 12th section declares that if such first election should result against subscription, the board of supervisors should, on the petition of 200 legal voters of the county, order another vote to be taken at any subsequent general election. Both of these elections were held, and resulted against subscription.

Section 3 of the act to amend the charter of this company, adopted on the 10th day of March, 1869, (Private Laws 1869, vol. 3, p. 334,) declares that sections 11 and 12 shall be so amended: "That hereafter the application of the board of directors, provided for in said section 11, for an election, and the petition, provided for in said section 12, shall be made and presented to the county clerk of the proper county, and not to the county court or board of supervisors, as in said sections 11 and 12 provided; and, thereupon, the county clerk of the county in which such application shall be made, or petition presented, shall give the notice of elections for subscribing to the capital stock of said company, as provided for in section 10 of said act to which this act is an amendment."

The county of Logan being one of the counties embraced in the provisions of the charter authorizing subscriptions, there would seem to be no doubt that it was intended to be included in this amended provision. Again, the amended act specifically provides the terms and conditions upon which the bonds of Logan county should be issued in case an election should be held and the vote should result in favor of subscription.

We can, from the various provisions of the amendatory act, entertain no doubt that there was ample power to hold this election in the manner it was called.

It is objected that the return is not sufficiently certain in its averments of the illegality and fraud by which the majority for subscription was obtained. It is distinctly averred that the registry of voters was not used in two of the townships, as a violation of the law. It is further averred that the declared majority was wholly made up of fraudulent and illegal votes, cast by persons not entitled to vote at the election. These averments are specific, certain and entirely unambiguous. To have gone into detail and stated the reason why they were illegal and fraudulent, would have required the statement of the specific facts concerning each vote illegally

cast, and the kind of fraud employed to have such votes cast. This would lead to great prolixity, and would unnecessarily encumber the record. We see no objection to the manner in which these facts are pleaded.

As to the objection that the judges of the election were not present at or acted in holding it in the two townships named, we see no force. The statute has made provision that in case the judges of election shall fail to attend, others may be substituted to act in their stead; and others having acted in this case, we will presume that they were legally selected and authorized under the statute to act as judges. There is no averment that any essential requirement of the statute was omitted in their selection and qualification. Courts will not presume that officers who are found acting and discharging the duties of an office were acting without warrant of authority. They were officers *de facto*, and that must suffice until it is shown they were intruders, acting without color of office; and we are not prepared to hold, even then, that the entire voting population of these townships would have been thereby disfranchised.

Nor does the admission that the registry of voters was not used, invalidate the election. Although the registry may not have been present at the polls, and may not have been referred to, it does not follow that illegal and fraudulent votes were cast. For aught we can see, none but persons whose names were on the registry may have voted. The carelessness or fraud of the judges in not using the registry lists can not be held to deprive the electors of the right to exercise the privileges reserved to them by the constitution. That is not a right which they hold at the caprice of the judges of election. It is by a firmer tenure than the will of those who have been designated to receive and register the votes in the precinct. Neither the negligence, incapacity, nor the fraudulent purposes of the election board, can, in this manner, deprive communities of this right. The board may incur liability to penalties by omitting such a duty, but not deprive the citizen of the right

to participate in the determination of questions of public interest referred to the voters for settlement. There is no averment that fraudulent or illegal votes were cast by reason of not using the registry at the election in these townships, and, even if there had been such votes cast, it could not have deprived the legal voters of their constitutional right, even had the general assembly declared such election void.

Whilst the averment that there were a greater number of fraudulent and illegal votes cast than the declared majority in favor of the subscription, is sufficient to authorize a recanvass of the poll lists, and to correct them by striking out the illegal votes, still the question is presented whether respondents are not estopped from setting that up as a defense in this proceeding.

The return admits the filing of a bill, by citizens of Logan county, against relators and the board of supervisors, to have the election declared void, which charged, among other things, " that a majority of the legal votes cast at said election were not cast in favor of said subscription, but were, in fact, cast against the same; that a portion of the votes so cast at said election were fraudulent and illegal, and that said pretended election was a carnival of violence and fraud." The return also admits that the venue of said cause was afterwards changed to the circuit court of Macon county; that the board of supervisors employed solicitors to defend said cause; that on the 10th day of June, A. D. 1870, the answer of said board was filed to said bill, which said answer traversed and denied all fraudulent and illegal voting so made in said bill, and averred that a majority of the legal votes cast at said election were cast in favor of such subscription. Said answer further admitted that said board of supervisors intended to make the subscription so voted for at said election, and to issue the bonds of said county to the relator therefor as soon as the latter had complied with the terms of said subscription as provided by law.

Here we find that Logan county, through its financial and business agents, the board of supervisors, in their answer to that bill, denied the fraud charged, and by their answer alleged that the board intended to subscribe the stock and issue the bonds. But such statements contained in an answer, and especially when it was not sworn to, have never been held to be an estoppel and conclusive upon the defendant. They are rather regarded as the suggestions of counsel, made to have effect only in the particular case. Nor could it be reasonably said that the officers of a county, charged with the management of its financial affairs, can have the power to bind the county to a fraudulent transaction. The rule is, as a general rule, subject it may be to some exceptions, that such officers can only bind the municipality whithin and to the limit of their power. The board of supervisors could not bind the county, by subscription or other admission, to issue bonds unless it was authorized by the law. They could, by no act of theirs, in the absence of power, bind the county to issue these or other bonds.

It then remains only to see whether, from this record, the board had such power. It is the vote of the citizens of the municipality, legally qualified to exercise the elective franchise, who can confer the power; and they, to do so, must substantially conform to the requirements of the law authorizing the vote to be had.

In this case the return alleges and the demurrer admits that there was not a majority of the legal votes cast at the election in favor of subscription. This being true, the essential element necessary to confer the power, the consent of a majority of the legal voters of the county, was wanting, and in its absence the board of supervisors could neither make a valid subscription, nor make statements, nor pass resolutions that would bind the county. Hence, the statements relied on in the answer can not be held to preclude the present board of supervisors from showing fraud, as alleged, in

conducting the election. These are the views of a majority of the court on this question.

It is, however, urged that the county, by *laches*, has lost all right to raise the question of fraud in the election; that having remained inactive until relator contracted for the construction of the road, the payment of these bonds to the contractors as a part of the consideration for building the road, and the road having long since been completed, the county can not now resist the issue of these bonds. And in support of this proposition, the case of *Prettyman* v. *Tazewell county*, 19 Ill. 406, is referred to as authority. This case is distinguishable from that in several material particulars. In that case, whilst it was alleged there was fraud in conducting the election, and that fraudulent votes were cast, still it was not alleged that if the polls had been purged of all illegal votes, and all had been allowed that was claimed on account of the fraud, there were not a majority, still, in favor of subscription; whilst, in this case, it is averred, and admitted by the demurrer, that the entire declared majority is composed of illegal votes, and that there was not a majority of the legal votes cast in favor of subscription.

Again, in that case, there was no allegation that the railroad company had any knowledge that illegal votes were cast, or that fraud in conducting the election had been perpetrated; whilst, in this case, the return avers not only that the fraud was perpetrated as set out therein, but relators had knowledge of its existence before they entered into the contract for the construction of the road, or before they had incurred any liability on the faith of the vote, or that the bonds would be issued. These are clear, broad and material distinctions between that case and this.

If the company, as they admit by the demurrer, knew of the fraud, as averred in the return, they can not be heard to say they have, in good faith, relied upon this vote for a subscription as a portion of the funds with which to build the road. They must have known that they had no legal or

25—63D ILL.

moral right to compel a subscription or the issue of the bonds on such a fraudulent election as their demurrer admits was held in this case. And knowing there was not a majority of the legal votes cast in favor of subscription, they knew there was no legal power to make the subscription or to issue the bonds. Knowing of the fraud before they incurred liability, they are as fully bound by it as if they had participated in its perpetration. If, then, there was fraud averred, and the company knew of it before contracting or incurring liability, they have no right to compel the county to issue the bonds. Had they contracted or incurred liability in the honest belief that the election was fair and free from fraud, or had the bonds been issued and in the hands of innocent holders, then a different question would be presented. But the bonds have not been issued, and the rights of no one but the original parties to the transaction are involved, and the demurrer admits that the company had notice before they incurred liability.

We now come to consider whether the manner in which the contract to construct the road was made, and in which it was leased, as set forth in the return and admitted by the demurrer, constitutes a defense. It is alleged that the contract gave those who built the road too large a sum for its construction. This may all be true, as the demurrer admits, but we are not aware that such a defense could be interposed by an individual to avoid the payment of calls on his subscription. The directors of these bodies are clothed with power to make contracts, and, when made, the stockholders must be bound by them. If fraudulently made, then the stockholders might, no doubt, file a bill to have it rescinded, or perhaps have their remedy at law against the directors. This is not a sufficient answer to the petition.

As to the lease, it, like the contract, incumbered the road, but as that incumbrance extinguished the former, it left the road in no worse condition than it was before. The directors had the power, under the seventh section of their charter, (Private Laws 1867, vol. 2, p. 701,) to borrow money,

to issue bonds, and to mortgage the property, income or franchises to secure the same.   The voters of the county must be presumed to have known this fact when the subscription was voted, and knowing that fact, they must be held to have acted with the view that the power would be exercised as a means of constructing the road.   This forms no defense to the petition.   If the mortgage was fraudulently made, with the design of procuring more means than was required for the construction and equipment of the road, and to misapply a portion of the means thus obtained, the stockholders would, no doubt, have an ample remedy in a court of equity.

If the company gratuitously gave the Toledo, Wabash and Western Railway Company the $800,000 of stock, or if it was given for the fraudulent purpose of depriving the stockholders of dividends, or of destroying the value of their shares, or to prevent them from exercising their legal power of control over the road in the election of directors or otherwise, then equity would, no doubt, afford relief.   And the county, after it shall have subscribed, issued its bonds and received its stock, could, no doubt, pursue any legal remedy in the same manner as any other stockholder.

If the company have exceeded their powers by giving a perpetual lease instead of one for years, the question can be tried whether it is void, or may be reformed by a bill in equity.   These are remedies the county may pursue after receiving its shares of stock, but can not adjudicate them in this proceeding, which is not adapted to such litigation, and even if the facts averred can be proved, they form no excuse for not paying subscriptions previously made.

It is also urged that the county can not be compelled to subscribe for stock in the railroad company.   The thirteenth section of the charter imposes it as a duty on the board of supervisors to make such subscription, without unnecessary delay, after the vote has resulted in favor of subscription.

The language of the law is peremptory, and leaves no discretion to be exercised by the board of supervisors when the

majority in a legal election has so determined. *Piatt* v. *The People,* 27 Ill. 65.

If it be true, as contended, that the general assembly has no power under the constitution to compel a municipality to incur a debt against the will of it citizens, still, in this case, if the citizens did consent, as claimed, knowing the law would compel the subscription, it would be their act, and not alone the act of the law. They knew it was compulsory, and not discretionary, if a majority was legally cast therefor. It can not in any sense be said that such a vote would be to compel the county to create a debt against the wishes of the citizens.

The charter being peremptory in its requirements, the case of *The People ex rel.* v. *The County of Tazewell,* 22 Ill. 157, could not apply. The law of 1849 gave a discretion, whilst in this there is none to be exercised. The case of *Aspinwall* v. *The Commissioners of the County of Daviess,* 22 Howard, 367, is not in point. There, as we understand the case, the new constitution prohibited the subscription, whilst ours expressly saves all subscriptions voted before the adoption of the constitution. Had it not been for this saving clause that case would have been in point. We can see no conflict between the charter which authorized this subscription and the section of the constitution relating to subscriptions by municipal corporations to railroads, which declares they may be made when the same had been authorized by a vote of the people of such municipality, before the adoption of the constitution, under previously existing laws. They are in perfect harmony, as this vote was taken before that instrument was submitted to a vote of the people for adoption.

The demurrer must be sustained to all of the return except that portion which avers the fraud in holding the election by permitting illegal votes to be cast thereat; and that more illegal votes were cast than the declared majority in favor of subscription; and that a majority of the votes cast was

against subscription; and that relators had notice of the same; to which averments it is overruled and relators, according to the stipulation filed herein, will have leave to traverse the same and form an issue in fact thereon.