The State of Florida *ex rel* The Railroad Commissioners of The State of Florida; The Attorney-General of said State, and J. M. Barrs, as Special Counsel for The Railroad Commissioners of The State of Florida, *Plaintiff,* v. Seaboard Air Line Railway, a Corporation Under the Laws of the States of Virginia and North Carolina, *Defendant.*

1. The contracts set forth in the statement and opinion under which the Seaboard Air Line Railway controls and operates the Florida West Shore Railway give the former the "right, license or permission to operate" the latter and the latter is "in use" by the former and "operated by" it under such a "contract or agreement" as brings it within the meaning of the Railroad Commission law so that the Railroad Commissioners have power under section 6 of that law to make reasonable and just rates of freight and passenger tariffs to be observed by the former in the operation of the latter although under the terms of the contracts the former is not entitled in its own right to the income or profits of the business.

2. In determining whether rates of freight and passenger tariffs established by the Railroad Commissioners for railroad transportation in this State are reasonable the cost of construction should not be deducted from the estimated earnings under the proposed rates, but the reasonable cost of construction may

and should be considered in determining the fair value of the property engaged in transportation.

3. In determining whether rates of freight and passenger tariffs established by the Railroad Commissioners for railroad transportation in this State are reasonable no part of the earnings or losses from interstate and foreign commerce can be charged to or against the income account of the transportation company, but its interstate and foreign business may and should be considered in determining the proportion of the value of the property of the company assignable to local business, and for other purposes.

4. The return to an alternative writ of mandamus seeking to compel a railroad company to put into effect and operation a schedule of tariffs prescribed for it by the Railroad Commissioners which alleges positively and unequivocally that the passenger and freight tariffs prescribed for it by the Railroad Commissioners are unreasonable, and that they do not give to the company fair and reasonable compensation for the services required to be performed by it is sufficient to tender an issue as to the reasonableness of the rates, without setting up all the facts bearing upon the question of reasonableness, and under such an issue any and every fact pertinent to the question of reasonableness is properly admissible.

This case was decided by the court *En Banc.*

This is a case of original jurisdiction.

### Statement.

On February 2nd, 1904, an alternative writ of mandamus issued from this court alleging: "1. That the Florida West Shore Railway is a railroad company, a corporation of the State of Florida, and has constructed its line of railway from a point about four miles southwest of Turkey Creek, a station on the main line of the Florida Central and Peninsular Railroad, which railroad is now known as the Seaboard Air Line Railway, at which point the said line of railway of the Florida West Shore Railway connects with a branch of the said Florida Central and Peninsular Railroad, known as the 'Turkey Creek Branch,' and runs in a southwesterly

direction to the town of Sarasota, in Manatee county, Florida, with branch lines to Terra Ceia, Lemon and Palmetto, and that all of the said main line and branch lines of said Florida West Shore Railway are within the State of Florida.

2. That the Seaboard Air Line Railway is a corporation of the States of Virginia and North Carolina, and now controls and operates, and, since the 1st day of June, 1903, has controlled and operated the said Florida Central and Peninsular Railroad, known as the Seaboard Air Line Railway, and owns, controls and operates, or controls and operates divers other lines of railroad in the State of Florida.

3. That the said Seaboard Air Line Railway and the Florida West Shore Railway entered into a contract with each other on the 1st day of June, A. D. 1903, in which it was agreed by them as follows, to wit: 'This agreement made and executed on this the first day of June, A. D. nineteen hundred and three (1903) between the Seaboard Air Line Railway, a corporation of the States of Virginia and North Carolina, hereinafter called the 'Seaboard,' party of the first part, and the Florida West Shore Railway, a corporation of the State of Florida, hereinafter called the 'West Shore,' party of the second part;

'Whereas, the West Shore has constructed its line of railway from a point about four (4) miles southwest of Turkey Creek, a station on the main line of the Florida Central & Peninsular Railroad (which latter railroad is controlled and operated by the Seaboard Air Line Railway,) at which point the said line of railway of the West Shore connects with the Turkey Creek branch of the said Florida Central & Peninsular Railroad, and runs in a southwesterly direction to the town of Sarasota, in Manatee county, Florida, with the branch lines to Terra Ceia, Lemon and Palmetto; and

Whereas, the West Shore contemplates the extension of its said line of railway from Sarasota southwardly to a point at or near Charlotte Harbor in DeSoto county, Florida; and

Whereas, the West Shore has no equipment, rolling

stock or motive power, and is unable to operate its said line or railway without the acquisition of the same; and

Whereas, the Seaboard desires to derive the benefit from the opening up and development of the territory through which the railway of the West Shore runs; and

Whereas, it is deemed to be to the mutual interest and advantage of the stockholders of the Seaboard and of the West Shore that the railway of the West Shore should be operated in connection with the Seaboard;

Now, then, in consideration of the premises, and of the advantages and benefits to be derived by each of the said parties from the contract of the other, it is hereby mutually covenanted and contracted as follows:

First. The Seaboard agrees to furnish the West Shore Railway with the necessary equipment for the operation of its line of railway and agrees to cause the same to be operated by its officers and agents for the benefit of the stockholders of the West Shore.

Second. The term 'equipment' shall embrace engines and coaches, freight and passenger, switch engines or construction trains and rolling stock of every kind and description, necessary in the operation of the railroads, together with all tools, implements and other accessories incident thereto.

Third. The West Shore shall pay for the use of said equipment the same rentals which the Seaboard now charges its ancillary lines for the use of similar equipment, it being understood that if at any time either party shall become dissatisfied with the rate of rental so charged, such party shall have the right to call for a re-adjustment of said rate and if such re-adjustment can not be had by agreement, then the question of rentals shall be submitted to arbitrators to be selected as hereinafter provided, who, after investigation of the matter, shall decide whether or not in equity and justice there ought to be any change in the rate of rental, and if so, fix a rate which, in their judgment, would be fair and equit-

able to all concerned, and the decision of the arbitrators in the premises shall be conclusive upon both parties hereto.

Fourth. The West Shore agrees that it will bear such proportion of the salaries of the officers of the operating and traffic departments of the fifth division of the Seaboard as the mileage of the West Shore bears to the mileage of the said division, which said proportion is hereby fixed at the sum of three hundred and fifty dollars ($350) per annum.

Fifth. It is understood and agreed that the compensation for the use of equipment hereinbefore provided, and the proportion of salaries to be paid by the West Shore shall be considered as part of the operating expenses of the railway of the West Shore.

Sixth. It is understood and agreed that the taxes, assessments, insurance, damages to persons or property incurred by reason of the running of cars or through the operation of the railroad, and all other items of expense of every class and description customarily included in the operating expenses of a railroad, shall be considered as part of the operating expenses of the railway of the West Shore.

Seventh. It is understood and agreed that the sum of one hundred and twenty-five dollars ($125) per month shall be allowed and paid to the West Shore out of the earnings of the railway to be used by it in paying the salaries of such of its officers as are not engaged in the direct operation of the company, and in otherwise keeping up the corporate organization of the company, and the said allowance to be considered as a part of the operating expenses of the West Shore.

Eighth. The Seaboard agrees to guarantee the payment, as the same matures, of both the principal and interest of a series of bonds of the West Shore, known as First Mortgage Four per cent (4 per cent,) Thirty-Year Gold Bonds, issued and to be issued at the rate of fourteen thousand dollars ($14,000) per mile, of which eleven thousand five hundred dollars ($11,500) per mile shall be used in payment for the construction of the railway of the West Shore,

134    SUPREME COURT OF FLORIDA,

State *ex rel.* R. R. Com'r's *et al.* v. S. A. L. Ry.—Statement of Case.

and the remainder of said bonds, to wit: twenty-five hundred dollars ($2,500) per mile to remain in the treasury of the company and only to be used for its legitimate corporate purposes, by resolution of the board of directors of the West Shore, sanctioned and approved by resolution of the board of directors of the Seaboard.

Ninth. It is understood and agreed that in the event the gross earnings derived from the operation of the railway of the West Shore are not sufficient to meet the operating expenses and fixed charges of said railway, as hereinbefore provided, the Seaboard will make good any such deficiency, and the West Shore, in consideration thereof, hereby covenants and agrees that at the expiration of every six (6) months it will execute to the Seaboard its non-interest bearing obligations wherein it will bind itself to pay to the Seaboard any such deficiency for the six (6) months immediately preceding, out of the net earnings of the company, over and above the operating expenses and fixed charges and the same may hereafter accumulate from time to time, and it is distinctly understood and agreed that no dividends can be declared on the capital stock of the West Shore so long as any of its obligations for deficiency in income, as aforesaid, are outstanding and unpaid.

Tenth. The Seaboard agrees that it will treat the West Shore as a favored connection and give it a fair and equitable proportion of the revenue derived from the interchange of business between the companies.

Eleventh: It is understood and agreed that the officers and agents of the Seaboard who may be charged with the operation of the line of railway of the West Shore, shall in all matters pertaining to the business of the West Shore, be deemed and considered the officers and agents of said company.

Twelfth. It is understood and agreed that the president and director of the West Shore shall be entitled to annual passes over all lines operated by the Seaboard in the State of Florida, including the line of the West Shore.

VOL. 48, JUNE TERM, 1904. 135

State *ex rel.* R. R. Com'r's *et al.* v. S. A. L. Ry.—Statement of Case.

Thirteenth. The Seaboard agrees that it will keep accurate books of account of the revenue of the West Shore and will render monthly to the president of the West Shore an itemized statement of the earnings and expenses of said railway, and it further agrees that it will pay into the treasury of the West Shore on or before the fifteenth day of each month any surplus of earnings of the preceding month, after having deducted cost of operation.

Fourteenth. In case differences should arise between the parties hereto as to the interpretation and meaning of any clause or phrase of this contract, it is agreed that such differences shall be submitted to a board of arbitrators for adjustment, the Seaboard to select one arbitrator and the West Shore one arbitrator, and the two arbitrators thus chosen to select an umpire; the award of the board of arbitrators shall be final and conclusive upon the parties.

In witness whereof, the parties hereto have caused these presents to be executed by their respective presidents and sealed with their respective corporate seals, duly attested by their respective secretaries, the day and year first above written.

4. That the said Seaboard Air Line Railway has since the 1st day of June, A. D. 1903, controlled and operated, 'and now controls and operates the said Florida West Shore Railway and its branch lines under the said contract of June 1st, A. D. 1903, hereinbefore set out, and the said Florida West Shore Railway is now, and since the 1st day of June, A. D. 1903, has been under the management and control of the said Seaboard Air Line Railway, and under one and the same management as the Florida Central & Peninsular Railroad, *alias* the Seaboard Air Line Railway.

5. That on the 25th day of June, A. D. 1903, the Railroad Commissioners of the State of Florida, in session at their office in Tallahassee, Florida, having previously given due notice to the said Seaboard Air Line Railway, and after having heard argument in behalf of said company, ordered and adjudged that a certain schedule of freight tariffs should

be allowed and adopted for freight shipments from points in Florida to points in Florida over the Seaboard Air Line Railway, to apply to shipments from or destined to points on the Florida West Shore Railway, and from points on the Florida West Shore Railway to points on the Florida West Shore Railway, and that the same should be put into operation and become effective on the 1st day of July, A. D. 1903, notice of which was given to the said Seaboard Air Line Railway, and that the said schedule of freight tariffs adopted in and by the said order of the said Railroad Commissioners is the same as appears in the duly certified copy of said order hereto attached and marked 'Exhibit A.'

6.    That the Seaboard Air Line Railway has not yet adopted said schedule of freight rates, as fixed in said order, and still refuses so to do, but on the contrary thereof charges freight tariffs for freight shipments from points in Florida to points in Florida over the Seaboard Air Line Railways from or destined to points on the Florida West Shore Railway, and from points on the Florida West Shore Railway to points on the Florida West Shore Railway, in excess of the rates fixed in and by said order, and in violation of said order, and of Chap. 4700 of the laws of Florida, and of Rule 1 of rules governing the transportation of freight, duly adopted by the Railroad Commissioners of Florida, and operative since November 1st, A. D. 1897, which said rule is as follows, to-wit:

'III. Rules Governing the Transportation of Freight.' Connecting Railroads under the Same Management.

1. All connecting railroads which are under the management or control, by lease, ownership or otherwise, of one and the same company, and all connecting roads, the majority of whose stock is owned or controlled, either directly or indirectly, by one of the connecting lines shall, for the purpose of transportation, in applying their schedule of freight rates, be considered as constituting but one and the same road, and the rates shall be computed as upon parts of one and the same road, unless otherwise specified.

VOL. 48, JUNE TERM, 1904.		137

State *ex rel.* R. R. Com'r's *et al.* v. S. A. L. Ry.—Statement of Case.

The fact that each of said roads has a separate board of directors shall not prevent the application of this rule. Whenever any railroad company owns and operates in connection with its road, and for the purpose of transporting its cars, freight or passengers, any steamer or other water craft, such steamer or water craft shall be deemed a part of its said road."

The writ commanded defendant immediately to put into operation and effect the schedule of freight tariffs adopted in and by said order of the Railroad Commissioners, or show cause on February 16, why it refuses to do so. The order of the Commissioners made a part of the writ is as follows, omitting the schedule therein referred to:

"Order No. 25. Railroad Commission, State of Florida:

In the Matter of Freight Rates for the Seaboard Air Line Railway Company to Apply on Shipments to and from points on the Florida West Shore Railway.

This matter coming on to be heard after due notice to the Seaboard Air Line Railway Company, and the Seaboard Air Line Railway Company being represented by G. P. Raney, Esq., and E. D. Kyle, Asst. Gen'l. Frt. Agt., and the Commission having heard the arguments of G. P. Raney, Esq., and E. D. Kyle, Asst. Gen'l. Frt. Agt., in behalf of the said Seaboard Air Line Railway Company and the Commissioners being satisfied that the present condition of the freight business of the Florida West Shore Railway would justify the ordering into operation of the proposed freight tariff on that line.

It is hereby **ordered and adjudged** by the Railroad Commission of the State of Florida, that the following schedule of freight tariffs shall be allowed and adopted for freight shipments over the Seaboard Air Line Railway, to apply only to shipments from or destined to points on the Florida West Shore Railway; and from points on the Florida West Shore Railway to points on the Florida West Shore Railway, and the same shall be put into operation and be effective on the 1st day of July, A. D. 1903."

The defendant moved to quash the alternative writ, and the motion was denied March 29, 1904, without a written opinion being filed. The return of the defendant, filed April 12, 1904, admits that it entered into the agreement of June 1, 1903, with the Florida West Shore Railway, and that it did control and operate the main and branch lines of the latter road under said contract for sometime thereafter, but that afterwards the two companies entered into a new agreement in place of and as a substitute for said agreement and contract of June 1st, 1903, and afterwards the new contract was reduced to writing and executed by the two companies, and that since the new agreement was entered into, which was before the alternative writ issued, the defendant had not controlled or operated the main and branch lines or any part of the Florida West Shore Railway, otherwise than under the terms of the new or substituted agreement, which was filed with the Railroad Commissioners on February 4th, 1904; that the management and operation by the defendant of the Florida West Shore Railway and its branch lines under said new or substituted contract, does not constitute the two railways one and the same road under rule 1 of the Railroad Commission set out in the alternative writ which requires that rates upon such roads shall be computed as upon parts of one and the same road. The return further alleges "that the schedule of freight tariffs adopted by the Florida Railroad Commission in and by the order of June 25, 1903, and annexed to the alternative writ in this case, does not afford and give to the defendant a reasonable and just tariff of rates for freight shipments over the Seaboard Air Line Railway from or destined to points on the Florida West Shore Railway or from points on the Florida West Shore Railway to points on the Florida West Shore Railway, and that such tariff of rates with the tariff of passenger rates prescribed by the Railroad Commission and now in operation over the said Florida West Shore Railway and the Seaboard Air Line Railway are not sufficient to afford the Seaboard Air Line Railway and the Florida

VOL. 48, JUNE TERM, 1904.                    139.

State *ex rel.* R. R. Com'r's *et al.* v. S. A. L. Ry.—Statement of Case.

West Shore Railway a reasonable income from the operation of said roads or in fact any net income from the operation of such roads in the conduct of business local to the State of Florida, and not including commerce between the States or foreign commerce over and above the reasonable cost of constructing and maintaining said railroads and paying the fixed charges thereon.

The new or substituted contract attached to and made a part of the return is substantially in the language of the contract of June 1, 1903, except in the following particulars: The ninth paragraph of the first contract is omitted from the second, the eighth was changed so as to read as follows:

"*Eighth*: The Seaboard agrees to guarantee the payment, as the same mature, of both the principal and interest of seven hundred and twelve thousand dollars ($712,000) par value of a series of bonds of the West Shore, known as 'First Mortgage Five Per Cent. (5 per cent.) Thirty (30) Year Gold Bonds' issued and to be issued at the rate of twelve thousand dollars ($12,000) per mile.

The West Shore agrees that no dividends shall be declared on any of its stock, without the permission of the Seaboard, until January 1, 1909. The West Shore also agrees that it will at all times elect as members of its board of directors two (2) nominees of the Seaboard."

The new contract provides for annual passes for the president and directors of the West Shore "over all lines operated by the Seaboard including the line of the West Shore," instead of confining the passes to lines operated by the Seaboard in Florida as in the first contract.

A new paragraph was added to the substituted agreement as follows:

"*Fourteenth*: The provisions of this agreement are effective and operative from and after the first day of June, 1903, and shall continue in force during the life of said bonds: Provided, however, that the West Shore shall have the right at any time after January 1st, 1909, by a majority vote of its stockholders, to determine this agreement upon

giving six (6) months' notice in writing to the president of the Seaboard of its intention so to do, having first (that is to say, prior to the expiration of said six (6) months,) either paid off or retired the said issue of bonds, or otherwise relieved the Seaboard from all liability on its guarantee of said bonds, in a manner satisfactory to the counsel of the Seaboard."

On May 17th, 1904, the defendant filed by leave of this court, a further and additional return, which sets up the new or substituted agreement and claims that the operation and management of the West Shore under the new agreement does not constitute the two roads one and the same road under rule 1 of the Railroad Commissioners so as to require that rates upon such roads shall be computed as upon parts of one and the same road, substantially as the same matters were set up in the former return, and in addition the return alleges "that the schedule of freight tariffs adopted by the Florida Railroad Commission in and by the order of June 25, 1903, and annexed to the writ in this cause does not afford and give to the defendant a reasonable and just tariff of rates for freight shipments over the Seaboard Air Line Railway from or destined to points on the Florida West Shore Railway, or from points on the Florida West Shore Railway to points on the Florida West Shore Railway, and that such tariff of rates with the tariff of passenger rates now in operation over the Florida West Shore Railway and over the Seaboard Air Line Railway are not sufficient to afford the Seaboard Air Line Railway and said Florida West Shore Railway a reasonable income from the operation of said railroads in the conduct of business local to the State of Florida and including the earnings of said railroad in Florida from interstate and foreign commerce over and above the reasonable cost of constructing, maintaining and operating said railroad."

The plaintiff now moves to quash the returns and for a peremptory writ upon the following grounds: 1. Said returns are frivolous and evasive.

VOL. 48, JUNE TERM, 1904.                     141

State. *ex rel.* R. R. Com'r's *et al.* v. S. A. L. Ry.—Opinion of Court.

2.   Said returns are argumentative, and state conclusions of law.

3. The contract entered into by the respondent and the Florida West Shore Railway on January 15th, 1904, does not affect the relation maintained by the respondent to the Florida West Shore Railway under the contract of June 1st, 1903, between said railroad companies.

4. The respondent has now the same management and control of the lines of railroad of the Florida West Shore as it had under and by virtue of the contract of June 1st, 1903.

5. Said returns are insufficient to show that under said rule 1, the railroads of the respondent and the Florida West Shore Railway should not, for the purpose of transportation, in applying their schedule of freight rates, be considered as constituting but one and the same road.

6.   The questions of law raised in said returns were presented to the court in the motion of the respondent to quash said alternative writ, and the motion was denied by the court.

7. The last paragraph of said returns which deny the sufficiency of the rates prescribed by said Railroad Commissioners does not show that the said rates are unjust or unreasonable, nor are facts therein alleged from which the court could infer that the said rates are unreasonable.

8. Said returns do not state facts relied upon as a defense with such precision and certainty as to advise the court of all particulars necessary to enable it to pass judgment upon the sufficiency of the returns.

*W. H. Ellis,* Attorney-General, and *J. M. Barrs* for plaintiff.

*Geo. P. Raney* and *John C. Cooper* for defendant.

CARTER, J. *(after stating the facts).*—Sections 3 and 4, Chapter 4700, act of 1899 (the Railroad Commission Law),

prohibit any railroad, railroad company or common carrier from charging, collecting, demanding or receiving more than a fair or reasonable rate of toll or compensation for the transportation of passengers or freight, and from making unjust discrimination in its rates or charges of toll or compensation for transporting passengers or freight "upon its tracks or any of the branches thereof or upon any railroad within this State which it has the right, license, or permission to use, operate or control." Section 5 defines the term "railroad" as used in the act as including among other things, "all the road in use by any corporation, receiver, trustee or any other person operating a railroad whether operated under any contract, agreement, lease or otherwise." By section 6 the Railroad Commissioners are given power to "make reasonable and just rates of freight and passenger tariffs to be observed by all railroads, railroad companies and common carriers doing business in this State over their respective lines or connecting lines," and by section 8 they are required to "make and furnish to each railroad corporatio· doing business in this State as soon as practicable, a printed or written schedule of just and reasonable rates and charges for transportation of freight, passengers and cars upon its railroad or railroads under its control or management."

The returns do not deny, but specifically admit, that the defendant "did control and operate the main and branch lines of". the West Shore under the first contract. It does not deny that it controls and operates the same road under the second agreement, but denies simply that it controls and operates same otherwise than under the terms of the second agreement. A careful reading of that agreement satisfies the court that under its terms the Seaboard has "the right, license or permission to operate" the West Shore Railway, and that such railway is "in use" by the Seaboard and "operated by" it under "a contract or agreement," within the meaning of the Railroad Commission Law, and that under section 6 of that law the Commissioners are authorized to make reasonable and just rates of freight and passenger

tariffs to be observed by the Seaboard in the operation of the West Shore. There is nothing in the language of the statute which justifies the construction contended for, *viz*: that the operation of the road must be under such a contract as that the operation is for the benefit of the operating company as by a lease or other contract under which the operating company will be entitled in its own right to the income or profits of the business. We entertained the same view of the first contract in overruling the motion to quash the alternative writ, and see nothing in the substituted contract to cause us to change the opinion then entertained. The companies having entered into the relationship shown by the contract voluntarily after the passage of the Railroad Commission law have no ground to complain that their freight and passenger rates are to be fixed and regulated in view of that relation. It is contended, however, that the contract does not constitute the two roads, one road within the meaning of the Commission Rule No. 1 set up in the alternative writ. The regulation here sought to be enforced does not attempt merely to apply Rule No. 1 to the two companies, but sets forth and adopts a schedule of rates for all classes of freight transported to and from points on the Seaboard in Florida from and to points on the West Shore, and to and from points on the West Shore to and from other points on the same road. If, therefore, the language of the rule is not broad enough to embrace the present case, the special regulation here sought to be enforced is within the power conferred upon the Commissioners and can, therefore, be enforced notwithstanding the inapplicability of Rule No. 1, The court is, therefore, of opinion that the returns in so far as they rely upon the contract set up, furnish no answer to the writ.

The returns attempt to question the reasonableness of the rates established by the Railroad Commissioners. They contain general allegations that the rates are not just and reasonable, but these general allegations are qualified by other statements that the rates if enforced will not afford a

reasonable income or in fact any net income over and above the reasonable cost of constructing and maintaining said railroads. The original return goes further and includes with the cost of construction and maintenance the payment of fixed charges, which counsel admitted in argument means taxes and interest on outstanding bonds. The vice in this method of pleading lies in the fact that the question of reasonableness is made to depend upon the capacity of the rates to yield a net income over and above the cost of constructing and maintaining the road and the payment of fixed charges, whereas circumstances may exist under which rates are reasonable which do not afford a net income above the cost of operation and taxes, or the cost of operation, taxes and fixed charges. The returns set forth a few elements entering into the question as to what constitutes a reasonable rate, and attempt to make those elements controlling, whereas the conditions surrounding the operation of the road may deprive them of controlling force. The use of the words "reasonable cost of constructing" renders the pleading very ambiguous. The reasonable cost of construction is to be considered in determining the fair value of the company's property, which is an element entering into the question of reasonableness of the rate, but the cost of construction is not to be deducted from the earnings under the proposed rates in ascertaining if those rates are reasonable, for under such a rule the public would be compelled to pay for constructing the road without being entitled to its ownership.

The amended return seeks to test the reasonableness of the rates by taking into consideration as part of the income of the road a portion of the earnings from interstate and foreign commerce whereas under the decisions of the Supreme Court of the United States this can not be done. No doubt interstate and foreign business can and should be considered in determining the proportion of the value of the property assignable to domestic business, and for other purposes, but no part of the earnings or losses from such

business can be charged to or against the income account of the company in ascertaining the reasonableness of domestic rates. / See *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. Rep. 418; *Chicago, M. & St. P. Ry. Co. v. Thompkins,* 176 U. S. 167, 20 Sup. Ct. Rep. 336; *Minneapolis & St. Louis R. R. Co. v. Minnesota,* 186 N. S. 257. See, also, *San Diego Land & Town Co. v. City of National City,* 174 U. S. 739, 19 Sup. Ct. Rep. 804.

It is contended by relators that a return questioning the reasonableness of a rate sought to be enforced by mandamus must set up in detail the facts and figures from which the court can see that the rates are reasonable. There is force in the suggestion that as the law makes the rates *prima facie* reasonable, an attack upon such rates should be full and specific, showing facts from which the court can say affirmatively that they are not reasonable. No doubt some such degree of particularity would be required in a bill in equity seeking to enjoin such rates. But we do not think this case stands in the attitude of a bill in equity. Here an attempt is made to enforce the rates, and the alternative writ necessarily by implication at least alleges that the rates are reasonable. The relators are not required to set out specially the facts showing that the rates are reasonable because the law makes the schedule of rates prescribed by the Commissioners *prima facie* reasonable. The allegations of the return attacking the reasonableness of the rates are of the nature of a denial of the implied allegations of reasonableness in the writ. If particulars were required in the return it would lead to great prolixity in pleading, and so many elements enter into the question which would be of greater or less force according to circumstances, that it would be almost impossible to frame a return upon such a theory. We think a return which alleges positively and unequivocally that the passenger and freight tariffs prescribed by the Commissioners are unreasonable, and that they do not give to the company fair and reasonable compensation for the services required to be performed by it, may be held to suf-

48 Fla—10.

ficiently set forth the ultimate fact in this class of cases without requiring a more detailed statement of particular facts which after all are mere evidentiary facts bearing upon the ultimate fact. This rule obtains in negligence cases where it is only necessary to allege that the act was negligently and carelessly done, without further particulars, and we hold that from necessity in this class of cases allegations of the nature suggested will be sufficient. See *People ex rel. Pekin, Lincoln and Decatur Railroad Co. v. Board of Supervisors of Logan County,* 63 Ill. 374.

The third plea which was held good on demurrer in the case of *Pensacola & A. R. Co. v. State,* 25 Fla. 310, 5 South. Rep. 833, was very general in its language, the court remarking that under it any legitimate evidence upon the question of reasonableness might be given.

From the views expressed it results that the motions to quash the returns must be granted, but as respondent asks leave to amend, leave is granted to file an amended return denying the reasonableness of the rates prescribed on or before the 26th instant, the State to plead thereto on or before the 29th instant.

TAYLOR, C. J., and HOCKER, SHACKLEFORD and COCKRELL, JJ., concur.

WHITFIELD, J., being disqualified, took no part in the consideration of this case.