THE STATE OF FLORIDA *ex rel.* RAILROAD COMMISSIONERS, *Relators,* v. LOUISVILLE AND NASHVILLE RAILROAD COMPANY AND THE SEABOARD AIR LINE RAILWAY, *Respondents.*

1. When acting within the authority conferred upon them, a wide discretion is accorded to the Railroad Commissioners; and an alleged abuse of discretion by them must be affirmatively and sufficiently shown by admissions or proofs before the courts will interfere. Valid regulations of the Railroad Commission should be made effective as contemplated by the constitution and statutes.

State v. L. & N. and S. A. L. Ry. Co.—Syllabus.

2. A railroad common carrier may, in addition to the facilities and accommodations already furnished, be required to render a particular service that it is essentially the duty of the carrier to do for the reasonable convenience of its patrons among the public, and to meet the reasonable requirements of the public service undertaken.

3. Even though a particular duty of a railroad company if enforced would be in itself unremunerative and burdensome, such a result would be an incident to the service voluntarily undertaken, in consideration of the franchises permitted to be used for the public good, and the property rights of the carrier would not thereby be unlawfully invaded, if the particular service is reasonably necessary for the public con- -venience, and the burden to the carrier has some fair relation to the benefits accruing to the public, and the burden of the particular service, considered with reference to the entire business of the carrier, does not in reality amount to a denial to the carrier of a reasonable compensation for the service rendered by it as an entirety.

4. Where it appears that a particular service is a duty vitally necessary to the public, and its performance is essential in adequately rendering a general public service as a common carrier, the fact that the performance of the particular duty will be unremunerative will not in view of the nature of the duty to the public excuse non-performance.

5. If the performance of a particular useful, but non-essential duty will as a part of a general public service contribute to the public convenience, the fact that the particular service must be rendered at a loss, does not, in view of the nature of the duty required, excuse non-performance; but the loss occasioned by the performance of a particular duty may be considered in determining the reasonableness of the order requiring the particular service to be rendered.

6. The general and special powers conferred by the statutes of the State upon the Railroad Commissioners are ample to authorize them to make and enforce just and reasonable orders rules and regulations for the furnishing of reasonably adequate facilities and accommodations to the traveling

State v. L. & N. and S. A. L. Ry. Co.—Syllabus.

public by the operation of passenger trains separate from freight cars, and for establishing schedules to be observed in operating such passenger trains between points within this State; and all such orders, rules and regulations when made are by the statute declared to be *prima facie* reasonable and just.

7.   If particular regulations are reasonably useful and expedient for the just requirements of the public service being performed by a common carrier, thereby making it a duty of the carrier to render the service, the regulations if not illegal may be enforced even though the service required is not remunerative, unless it is made to clearly appear that the particular regulations are so unreasonable and arbitrary that their enforcement will operate to deny to the respondents a reasonable compensation for the entire service rendered by the carrier.

8.   In determining whether a rate, rule, regulation or order of the Railroad Commission upon a subject within its authority is so unreasonable and arbitrary as to be illegal and unenforceable, the court, in deference to the governmental functions conferred by law upon the Commissioners, will not only require the *prima facies* of reasonableness impressed by the statute upon the rate, rule, regulation or order to be overcome by admissions or proofs, but will require the admissions or proofs of facts tending to show unreasonableness to be clear and convincing, every reasonable doubt being yielded in favor of the rate, rule, regulation or order.

9.   The reasonableness of a rate, rule, regulation or order of the Railroad Commissioners is to be determined by a consideration of the rights of all parties directly and materially affected by the rate, rule, regulation or order. This involves a consideration of all the facts and circumstances by such appropriate processes and standards of reasoning and computation as are afforded by law or by common experience and the dictates of right and justice.

10.  In determining whether the burden of a particular regulation enforced by state authority is confiscatory and unlawful because it prevents a railroad company from receiving a

reasonable compensation for the service rendered taken as an entirety, the fair actual value of all the property and labor and management rightly used in rendering the service should be considered. The cost of reproduction of the property may be an element to be considered in ascertaining the real value of the property used, but it is not the value that is to be arbitrarily considered in determining what is a reasonable compensation for the service rendered as a whole by a common carrier.

11. Where the same property, labor and management are used at the same time by a common carrier in interstate and intrastate commerce, the value of the property and labor and management used should be properly apportioned in determining the reasonableness of the compensation for service rendered by the carrier in the intrastate business taken separately and as an entirety, or in connection with the interstate business concurrently done.

12. The State may enforce regulations to be observed by a, railroad common carrier in intrastate transportation for the safety and convenience of the public who are affected by the regulation even though interstate commerce is thereby indirectly and incidentally affected, without violating the interstate clause of the Federal Constitution, where such regulations are in aid of, or do not in fact impose substantial burden upon, lawful interstate commerce, or do not conflict with regulations of the subject that are legally prescribed or authorized by Congress.

13. Where a governmental regulation is directly prescribed by valid legislative enactment its expediency and reasonableness, when no violation of organic law is involved, will not be enquired into by the courts, since the legislature and the judiciary are co-ordinate branches of the State government, and legislative action is subject only to the organic law and is reviewable by the courts only when the supreme law of the land is violated.

14. Action taken by an administrative officer or board must not only be in accordance with organic law, but it must conform to applicable valid statutes and must be reasonable in its

operation. Such administrative action is also subject to judicial review as to matters that are not concluded by the exercise of administrative discretion and action.

15. The Railroad Commissioners may by reasonable and just rules and regulations require the running of passenger trains separate from freight trains, and such reasonable regulations will be enforced by the courts.

16. It is the duty of the carrier to render a service that is reasonably adequate and of most convenience to the greatest number of the public affected by the service.

17. The Railroad Commissioners are authorized to make and enforce only reasonable and just rules and regulations for intrastate transportation.

18. In determining the reasonableness of a regulation authorized by the statute "for the establishing of such schedules for the arrival and departure of trains at depots as public comfort and convenience may require," the necessities and convenience of the public to be affected by the regulation should be considered as a whole and severably, regard being had for the number and reasonable requirements of patrons at different points on the line, and from connecting lines, as well as the rights of the carrier.

19. Where it clearly appears that a schedule prescribed by the Railroad Commissioners for the operation of particular trains is not reasonable or just or practical with reference to all the interests directly affected thereby, such schedule will not be enforced by the courts.

20. The power to make reasonable rules and regulations for establishing schedules does not contemplate that the Commissioners shall arbitrarily assume the actual control and management of the physical property of the carrier, so as to unlawfully deprive the carrier of its right to manage its own property; but such grant of power does contemplate that the Railroad Commissioners by making and enforcing just and reasonable rules and orders shall supervise and regulate "the establishing" of proper schedules as in all other matters

affecting the service within the authority conferred by statutes.

21. The Railroad Commissioners may perform their duties conferred by statute without awaiting a specific complaint to be made to them.

This case was decided by Division A.

This is a case of original jurisdiction.

### STATEMENT.

The following alternative writ of mandamus was issued by this court:

"The State of Florida,
            To
The Louisville & Nashville Railroad Company and The Seaboard Air Line Railway.

GREETING:

WHEREAS, by a petition filed by our Railroad Commissioners in our Supreme Court in the name of the State of Florida, through F. M. Hudson as Special Counsel for our said Railroad Commissioners, designated by them, it has been made to appear:

1. That the Louisville and Nashville Railroad Company is a railroad corporation created and organized under the laws of the State of Kentucky and the said company owns and operates and for more than five years last past has owned and operated a line of railway lying partly within the State of Florida and extending therein from River Junction in a Westerly direction to Pensacola, and thence in a Northerly direction to the line of the State of Alabama, and thence into the State of Alabama.

2.   That the said company transports persons and property over its said line of railroad as a common carrier for hire, and over that portion of its said line of railroad which lies within the State of Florida it transports persons and property from points in this State to other points in this State as such common carrier for hire as aforesaid.

3.   That the Seaboard Air Line Railway is a railroad corporation created and organized under the laws of the State of Virginia and the said company owns and operates and for more than one year last past has owned and operated divers lines of railway within the State of Florida and in other States, and owns and operates and for more than one year last past has owned and operated a line of railway extending from Jacksonville in a Westerly direction to River Junction, both points in the State of Florida.

4.   That the said Seaboard Air Line Railway transports persons and property over its said line of railway as a common carrier for hire and over that portion of its said line of railway which lies within the State of Florida it transports persons and property from points in this State to other points in this State as such common carrier for hire as aforesaid.

5.   That the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway have heretofore provided and maintained and do now maintain physical connection between their said lines of railroad and ample facilities for the transfer of engines and cars from one to the other of said lines of railroad.

6.   That the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway have heretofore operated and are now operating a train leaving Jacksonville at, to-wit: 5 O'clock P. M. and arriving at

21—Vol. 62

Pensacola at, to-wit; 11:15 A. M., and known on the Seaboard Air Line Railway as train No. 79 and on the Louisville & Nashville Railroad as train No. 4, and a train leaving Pensacola, at to-wit; 5 O'clock P. M., and arriving at Jacksonville at, to-wit; 10:50 A. M., and known on the Louisville & Nashville Railroad as train No. 1 and on the Seaboard Air Line Railway as train No. 78.

7.   That the said trains have been and are now operated as a mixed passenger and freight trains carrying passenger coaches, sleepers and freight cars.

8.   That the schedule time of the said trains between Jacksonville and Pensacola is approximately eighteen hours.

9.   That on the 23rd day of August 1911, the said Railroad Commissioners did give notice to the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway and each of them, that there would be a meeting of the said Railroad Commissioners in their office in the City of Tallahassee on the 12th, day of September 1911, at 11 o'clock A. M. to consider whether the said commissioners should issue an Order directing the said companies and each of them to discontinue the hauling of freight cars on the said trains, and also to consider whether the said Commissioners should make and fix a schedule shortening the time of the run between the said points.

10.   And that thereafter on the said 12th, day of September 1911, at their office in the City of Tallahassee the said Railroad Commissioners being then and there duly . in session pursuant to the said notice, the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway then and there appeared and were fully heard in the premises, and thereupon the said Commissioners did make and enter their certain Order No. 346 in words and figures following, to-wit:

Order No. 346.
File No. 3125.

## BEFORE THE RAILROAD COMMISSIONERS OF THE STATE OF FLORIDA.

IN THE MATTER OF THE OPERATION BY THE LOUISVILLE & NASHVILLE RAILROAD COMPANY AND THE SEABOARD AIR LINE RAILWAY OF MIXED PASSENGER AND FREIGHT TRAINS BE-TWEEN PENSACOLA AND JACKSONVILLE.

After due notice to the Louisville & Nashville Railroad Company and the Seaboard Air Line Railway, dated August 23rd, 1911, this matter came on for hearing on the 12th, day of September 1911, at the office of the Railroad Commissioners in the City of Tallahassee; the said Louisville & Nashville Railroad Company being present by C. B. Phelps, Superintendent of Transportation, Mr. E. O. Saltmarsh, Superintendent, and Mr. Milton Smith, Assist-and General Freight Agent; the Seaboard Air Line Railway being present by Hon. W. J. Oven, Division Counsel, and Mr. W. A. Witt, Superintendent, and they were fully heard; and thereupon the matter was taken under advisement.

And now on this the 16th, day of September, 1911, we the Railroad Commissioners of the State of Florida, being fully advised in the premises, do find,—

That the Seaboard Air Line Railway and the Louisville & Nashville Railroad Company have heretofore operated, and are now operating a train leaving Jacksonville at 5 O'clock P. M. and arriving at Pensacola at 11:15 A. M., and known on the Seaboard Air Line Railway as train No. 79 and on the Louisville & Nashville Railroad as

train No. 4, and a train leaving Pensacola at 5 P. M. and arriving at Jacksonville at 10:50 A. M., and known on the Louisville & Nashville Railroad as train No. 1 and on the Seaboard Air Line Railway as train No. 78, and

That said trains have been and are now operating as mixed passenger and freight trains, carrying passenger coaches, sleepers and freight cars, and

That the schedule time of the said trains between Jacksonville and Pensacola is approximately eighteen hours,—

And that the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway have heretofore had under consideration the discontinuation of the hauling of freight cars on the said trains and the shortening of the schedule time of the said trains and the adoption of a schedule providing that the said East-bound train should leave Pensacola at 7:30 P. M. and arrive in Jacksonville at 9:15 A. M., and that the train running West should leave Jacksonville at 5:10 P. M. and arrive in Pensacola at 6:30 A. M., but that the said proposed schedule was not acceptable to the said Louisville & Nashville Railroad Company because of the fact that it provided that the West-bound train should arrive in Pensacola an an hour too early to suit the convenience and comfort of passengers between Crestview and Pensacola, and that for these reasons and other reasons the said companies have been unable to reach an agreement as to the discontinuation of the said freight cars and the adoption of a shorter schedule.

Wherefore, the said Railroad Commissioners in view of the premises do adjudge and order the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway to discontinue the hauling of freight cars on the said train leaving Jacksonville at 5 O'clock P. M. and arriving at Pensacola at 11:15 A. M., and known on

the Seaboard Air Line Railway as train No. 79 and on the Louisville & Nashville Railroad as train No. 4,

And that they also discontinue the hauling of freight cars on their said train leaving Pensacola at 5 P. M., and arriving at Jacksonville at 10:50 A. M., and known on the Louisville & Nashville Railroad as train No. 1 and on the Seaboard Air Line Railway as train No. 78.

And the said Commissioners do further order that the schedule time for the operation of the said trains be shortened and that the said companies shall operate the said East-Bound train as a passenger train and provide a schedule for the said train to leave Pensacola at 7 O'clock P. M. and arrive at Jacksonville at 8:45 A. M.

And that the said companies shall operate the said West-bound train as a passenger train and provide a schedule therefor to leave Jacksonville at 5:40 P. M., to meet the passenger train now known as train No. 66 Seaboard Air Line from Tampa to Jacksonville, at Whitehouse at 6:05 P. M. to arrive at Lake City at 7:49 P. M., and to arrive at Pensacola at 7:30 A. M.

And that this order shall be in force and of full effect on and after the first day of October 1911.

Done and ordered by the Railroad Commissioners of the State of Florida in session at their office in the City of Tallahassee, this 16th, day of September A. D. 1911.

R. Hudson Burr, Chairman.'

11. That the said Louisville & Nashville Railroad Company and the said Seaboard Air Line Railway have each of them ignored, disregarded and refused to obey the said Order No. 346 above set out in that they have failed and refused to discontinue the hauling the freight cars on the said train leaving Jacksonville at 5 O'clock P. M. and arriving at Pensacola at 11:15 A. M., and known on the

Seaboard Air Line Railway as train No. 79 and on the Louisville & Nashville Railroad as train No. 4; and in that they have failed and refused to discontinue the hauling of freight cars on the other said train leaving Pensacola at 5 O'clock P. M. and arriving at Jacksonville at 10:50 A. M. and known on the Louisville & Nashville Railroad as train No. 1 and on the Seaboard Air Line Railway as train No. 78, and in that they have failed and refused to shorten the schedule time for the operation of the said trains and have failed and refused to operate the said East-bound train as a passenger train or to provide a schedule for the said train to leave Pensacola at 7 O'clock P. M. and to arrive at Jacksonville at 8:45 A. M., or to operate the said West-bound train as a passenger train or to provide a schedule therefor to leave Jacksonville at 5:40 P. M., to meet the passenger train now known as train No. 66 Seaboard Air Line from Tampa to Jacksonville at Whitehouse at 6:05 P. M., to arrive at Lake City at 7:49 P. M. and to arrive at Pensacola at 7:30 A. M.,—but on the contrary the said companies have continued and now continue to haul freight cars on each of the said trains and have continued and are now continuing to operate the said trains upon schedule time of approximately eighteen hours, leaving Pensacola and arriving at Jacksonville and leaving Jacksonville and arriving at Pensacola at approximately the same time as before the issuance of the said order.

12.   And that the said Railroad Commissioners of the State of Florida and the people of this State are entirely without adequate remedy in the premises unless it be afforded by the interposition of this court through a writ of mandamus.

Now therefore we being willing that full and speedy justice be done in the premises, do command you, the

Louisville & Nashville Railroad Company and the Seaboard Air Line Railway forthwith.

To discontinue the hauling of freight cars on the said train leaving Jacksonville at 5 O'clock P. M. and arriving at Pensacola at 11:15 A. M., and known on the Seaboard Air Line Railway as train No. 79 and on the Louisville & Nashville Railroad as train No. 4;

And to discontinue the hauling of freight cars on the said train leaving Pensacola at 5 P. M. and arriving at Jacksonville at 10:50 A. M. and known on the Louisville & Nashville Railroad as train No. 1 and on the Seaboard Air Line Railway as train No. 78 ,

And to shorten the schedule time of the operation of the said trains.

And to operate the said East-bound train as a passenger train and to provide a schedule for the said train to leave Pensacola at 7 o'clock P. M. and to arrive at Jacksonville at 8:45 A. M.

And to operate the said West-bound train as a passenger train and to provide a schedule therefor to leave Jacksonville at 5:40 P. M. to meet the passenger train now known as train No. 66 Seaboard Air Line from Tampa to Jacksonville, at Whitehouse at 6:05 P. M. to arrive at Lake City at 7:49 P. M. and to arrive at Pensacola at 7:30 A. M.

Or, that you appear before the Justices of this our Supreme Court sitting within and for the State of Florida at the Court Room in the City of Tallahassee on the 24th, day of October 1911, at 10 o'clock in the morning of that day and show cause why you refuse so to do, and have you then and there this writ.

Witness the Honorable James B. Whitfield Chief Justice of the Supreme Court of the State of Florida, and

the seal of the said Court at Tallahassee the Capital this 3rd, day of October 1911.
(SEAL)                                   M. H. Mabry,
              Cleak of the Supreme Court of Florida."

The respondents filed the following return:

"And now come the respondents, the Louisville & Nashville Railway Company and the Seaboard Air Line Railway, by their attorneys, and for a return to the alternative writ of mandamus, issued from this court on the petition of the relators, in the name of the State of Florida, say:

1.    That these respondents admit all the facts set forth in the alternative writ;

2.    These respondents, further answering, say:    That they have not complied with the said Order No. 346, of the relators as the Commissioners of the State of Florida, mentioned in the said alternative writ, because the said order was, and is, unreasonable, unnecessary, arbitrary and impracticable, and if put into operation would be unduly and unnecessarily burdensome and expensive to these respondents; would greatly and unnecessarily inconvenience by far the greater portion of the public traveling upon the lines of road mentioned in said writ operated by these respondents, between Pensacola and Jacksonville; would greatly lessen the number of persons so traveling, and thus lessen the revenues of these respondents; would deprive persons shipping fast freight over said lines of the opportunity so to ship, and thus lessen the earnings of the respondents; would interfere, hinder and delay the passage of through trains now running on said lines, other than the trains mentioned in said Order; and would be of advantage or convenience to but a small percentage of the persons traveling over said lines;

3.   And these respondents further answering more in detail, say, as to the effect of putting into operation the said proposed schedule on the line of railroad between Pensacola and River Junction,—

a.   Train No. 4 of the Louisville & Nashville Railroad Company, now passes Milton, a town nineteen miles from Pensacola, at 10:10 A. M., and reaches Pensacola at 11:20 A. M.; Train No. 1 of the Louisville & Nashville Railroad Company, now leaves Pensacola at 5:15 P. M., and reaches Milton at 6:15. P. M.   Those persons who desire to do business or shop, in Pensacola, have an opportunity to leave Milton at a reasonable daylight hour, remain in Pensacola for six hours and return to Milton by or before dark.   Under the schedule fixed in Order No. 346, train No. 4 would pass Milton at 6:45 A. M., and arrive at Pensacola at 7:30 A. M., while train No. 1 would leave Pensacola at 7:00 P. M. and arrive at Milton at 7:45 P. M. thus requiring passengers from Milton to Pensacola to arise early in the morning; to spend 11½ hours in Pensacola, a large part before and a large part after business hours; and to return home at night.

Under the present schedule, many persons in Pensacola, having business in Milton, take train No. 3 leaving Pensacola at 6:45 A. M., and reach Milton at 7:24 A. M., transact business and return to Pensacola on train No. 4, passing Milton at 10:10 A. M., and arriving at Pensacola at 11:20 A. M., thus accomplishing business in Milton and having most of the business day left for Pensacola. Under the schedule proposed under Order No. 346 a person in Pensacola having business in Milton would have to remain there all day, because train No. 3 leaving Pensacola at 6:45 A. M. reaches Milton at 7:24 A. M. and train No. 4 would pass Milton at ———— A. M., and no other train passes Milton, going to Pensacola, until

train No. 2, at 9:00 P. M., so that every person having business in Milton would have to remain from 7:24 A. M. until 9:00 P. M. or nearly fourteen hours, a large portion of which would be before and after business hours.

So also, many persons at Pensacola, having business in Milton, take train No. 1, leaving Pensacola at 5:15 P. M., arrive at Milton at 6:15 P. M., transact their business and take train No. 2 leaving Milton at 9:00 P. M., thus having 2 hours and 45 minutes for the transaction of business. Under the proposed scheule, no such business could be transacted.    Milton is a thriving town, of more than 1,500 inhabitants; is the county site of Santa Rosa County; and does by far the larger portion of its trading in Pensacola. Not only it is the point of entraining and detraining on and from the Louisville & Nashville Railroad of its·own inhabitants, but is also such point for the inhabitants of thriving villages to the North of it in said county, and for the inhabitants of the milling towns of Bagdad, Bay Pont and Robinson Point, to the South of it, and all of said persons would be largely affected by and inconvenienced and burdened by said change of schedule.

There are now in operation two lines of steamers, carrying passengers from Milton to Pensacola and return, in competition with the Louisville & Nashville Railroad Company, and furnishing a daylight schedule, with an opportunity to remain in Pensacola three or four hours in the middle of the day, and return to Milton in the day time, and if the proposed schedule be put into effect, a large portion of the passenger travel of the Louisville & Nashville Railroad Company between Milton and Pensacola will necessarily be diverted to the said steamboats, thus largely decreasing the revenues of the Louisville & Nashville Railroad Company, without in anywise increas ing the convenience of the public;

b.   The village of Crestview is on the said Louisville & Nashville Railroad Company's line, about fifty miles East of Pensacola, and is the junction point of said line and the Yellow River branch of said Railroad Company, said branch running from Crestview to Florala, in the State of Alabama, through the County of Walton, Florida, and the village of Laurel Hill; that large numbers of persons' in Florida and adjacent territory, and at Laurel Hill and adjacent territory, trade and transact business in Pensacola, and that said persons will, if the schedule proposed by order No. 346 aforesaid be put into effect, be hindered and delayed and inconvenienced in the transaction of said business at Pensacola, and their return in the same way and to the same extent as persons in Milton and vicinity, as set forth in paragraph 2-a above; that in addition thereto, the inconvenience to said persons resulting from said schedule will be very great, in that train No. 4 will, under said schedule, pass Crestview going Westward to Pensacola at 5:40 A. M., and passengers from Florala and vicinity will be obliged to leave Florala by the Yellow River Branch at not later than 3:40 A. M., thus necessitating both the entraining at Florala, and the change at Crestview, to be, during the most of the season, at night, whereas, under the present schedule, train No. 4 passes Crestview at 8:23 A. M., and passengers for the same train leave Florala at 6:30 A. M.

That Florala has direct communication by rail with Andalusia and Montgomery, both important commercial centers, and trading points, and in competition with Pensacola, and the imposition by the said schedule under Order No. 346, of the proposed burdens and inconveniences upon passengers to and from Pensacola, will result in the diversion from Pensacola of much now existing travel, and of the trade incident thereto, and thus lessen the

income of the Louisville & Nashville Railroad Company and the trade of Pensacola;

c.   The town of DeFuniak Springs is on the said line of the Louisville & Nashville Railroad Company, and has about 1700 inhabitants; is the county site of Walton county, and is the point of entraining and detraining of a large portion of the inhabitants of the said county, and said inhabitants do the largest part of their business and trading in Pensacola, and by the schedule imposed by Order No. 346, will, in the transaction of their business be hindered in the same way and to the same extent as persons in Milton and vicinity, as set forth in paragraph 2-a above; that the inconvenience to them, however, will be greater than the inconvenience of those persons entraining at Milton, because under the proposed schedule the said train No. 4 would pass DeFuniak Springs at 4:30 A. M., while it would pass Milton at 6:45 A. M.   Under the now existing schedule, the said train passes DeFuniak Springs at 7:08 A. M.;

That in addition to the effect of the proposed schedule upon normal travel to and from DeFuniak Springs, it would greatly effect the large travel to said point during the season of the Florida Chautauqua, which has its exercises for two or three months at said point during each winter.   A very large portion of the persons who attend the said exercises come from the line of the Louisville & Nashville Railroad Company East of the said point; under the present schedule such persons can board train No. 4 at points as far east as Chipley, in Washington County, in daylight, while if the proposed schedule be put in operation, such persons must take the said train at night, and get off at DeFuniak at night, at hours which will greatly deter persons from attending the said exercises, and thus greatly affect the business of the said

Florida Chautauqua, and the said town of DeFuniak
Springs, and the revenues of the said Louisville & Nash-
ville Railroad Company. The comparative schedules of
the said train No. 4 as at present existing and as it would
be under the said Order No. 346, for points between River-
junction and Pensacola, is as follows:

| LEAVES | PRESENT SCHEDULE | PROPOSED SCHEDULE |
|---|---|---|
| River Junction | 3:20 A. M. | 1:20 A. M. |
| DeFuniak Springs | 7:08 A. M. | 4:30 A. M. |
| Florala | 6:30 A. M. | 3:40 A. M. |
| Crestview | 8:23 A. M. | 5:40 A. M. |
| Milton | 10:10 A. M. | 6:45 A. M. |
| Pensacola (arrive) | 11:20 A. M. | 7:30 A. M. |

d. The station of Galliver, on the said Louisville &
Nashville Railroad Company's line, about forty miles East
of Pensacola, is the junction point between the said rail-
road and the Florida, Alabama & Gulf Railroad, running
through the county of Santa Rosa, Florida, northward
into the county of Covington, Alabama. The said latter
railroad serves a large number of inhabitants of the said
county of Santa Rosa, Florida, and the county of Coving-
ton, Alabama, who do business and trade and shop at Pen-
sacola, and reach the said latter point by the trains of
the Louisville & Nashville Railroad Company. The
schedule now in operation permits said persons to do such
business, trading and shopping at Pensacola in the hours
mentioned in the paragraph 2-a heretofore set forth, per-
mitting to the inhabitants of Milton and neighboring
towns, and the change of the schedule to that proposed by
said Order No. 346, would embarrass, hinder, incon-
venience and prejudice the persons tributary to the said

Florida, Alabama & Gulf Railroad, in the same manner and to the same extent as the citizens of Milton and its vicinity are affected, as hereinbefore set forth. The inconvenience to them would be greater than to those mentioned in paragraph 2-a, for the reason that train No. 4 would, under the proposed schedule, pass Galliver, going towards Pensacola, at 6:05 A. M., while under the present schedule, it passes said point at 8:55 A. M.

e. That the inconvenience, prejudice, embarrassment and delay hereinbefore set forth, as applicable to the hereinbefore mentioned towns and junction points, will exist as to all of the towns lying on the Louisville & Nashville Railroad Company's line aforesaid, west of Jackson County, since the same time in Pensacola and the same hours would exist as to all other persons entraining on said train between said Jackson County and Pensacola. The inconvenience to them would be greater, because of the fact that the said train No. 4 will, if the said proposed schedule be put into effect, pass the said points to the East of DeFuniak Springs at a very much earlier hour, and, thereby produce the greater inconvenience referred to.

4. And these respondents further answering more in detail, say, as to the effect of putting into operation the said schedule on the line of railroad between Jacksonville and River Junction,—

a. The inconvenience to persons along the said line of the Seaboard Air Line Railway, in being required by the said proposed schedule to get upon train No. 78 much earlier than they are now required to get upon said train, by the existing schedule, is in kind the same as the inconvenience heretofore set forth, to persons taking train No. 4 of the Louisville & Nashville Railroad Company.

The comparative schedules of train No. 79 of the Sea-

board Air Line Railway as at present existing, and as it would be under said order No. 346 for points between Jacksonville and River Junction is as follows:

| LEAVES | PRESENT SCHEDULE | PROPOSED SCHEDULE |
|---|---|---|
| Jacksonville | 5:00 P. M. | 5:40 P. M. |
| West Jacksonville | 5:12 P. M. | 5:50 P. M. |
| Marietta | 5:21 P. M. | 5:57 P. M. |
| White House | 5:28 P. M. | 6:05 P. M. |
| Millerton | 5:35 P. M. | 6:14 P. M. |
| Baldwin | 5:46 P. M. | 6:25 P. M. |
| McClenny | 6:25 P. M. | 6:45 P. M. |
| Glen St. Mary | 6:35 P. M. | 6:50 P. M. |
| Sanderson | 6:56 P. M. | 7:04 P. M. |
| Olustee | 7:24 P. M. | 7:24 P. M. |
| Mt. Carrie | 7:33 P. M. | 7:32 P. M. |
| Watertown | 7:47 P. M. | 7:43 P. M. |
| Lake City | 7:54 P. M. | 7:49 P. M. |
| Ogden | 8:11 P. M. | 7:59 P. M. |
| Welbourn | 8:26 P. M. | 8:10 P. M. |
| Houston | 8:41 P. M. | 8:20 P. M. |
| Live Oak | 8:57 P. M. | 8.32 P. M. |
| Falmouth | 9:23 P. M. | 8:52 P. M. |
| Ellaville | 9:32 P. M. | 8:59 P. M. |
| Lees | 9:51 P. M. | 9:15 P. M. |
| Madison | 10:10 P. M. | 9:32 P. M. |
| Greenville | 10:43 P. M. | 10:02 P. M. |
| Aucilla | 11:03 P. M. | 10:18 P. M. |
| Drifton | 11:20 P. M. | 10:34 P. M. |
| Lloyd | 11:42 P. M. | 10:52 P. M. |
| Capitola | 11:52 P M. | 11:02 P. M. |
| Chaires | 12:01 A. M. | 11:07 P. M. |
| Tallahassee | 12:35 A. M. | 11:35 P. M. |

| | | |
|---|---|---|
| Midway ...................... | 1:05 A. M. | 12:05 A. M. |
| Quincy ...................... | 1:40 A. M. | 12:35 A. M. |
| Gretna ...................... | 2:00 A. M. | 12:50 A. M. |
| Mt. Pleasant ................ | 2:15 A. M. | 1:00 A. M. |
| River Junction .............. | 2:40 A. M. | 1:29 A. M. |

The comparative schedules of said train No. 78 of the Seaboard Air Line Railway, as at present existing and as it would be under said order No. 346, for points between River Junction and Jacksonville is as follows:

| LEAVES | PRESENT SCHEDULE | PROPOSED SCHEDULE |
|---|---|---|
| River Junction .............. | 1:50 A. M. | 1:00 A. M. |
| Mt. Pleasant ................. | 2:15 A. M. | 1:30 A. M. |
| Gretna ...................... | 2:25 A. M. | 1:38 A. M. |
| Quincy ...................... | 2:40 A. M. | 1:48 A. M. |
| Midway ...................... | 3:10 A. M. | 2:13 A. M. |
| Tallahassee .................. | 3:45 A. M. | 2:43 A. M. |
| Chaires ..................... | 4:20 A. M. | 3:08 A. M. |
| Capitola .................... | 4:25 A. M. | 3:13 A. M. |
| Lloyd ....................... | 4:35 A. M. | 3:23 A. M. |
| Drifton ..................... | 4:55 A. M. | 3:41 A. M. |
| Aucilla ..................... | 5:10 A. M. | 3:56 A. M. |
| Greenville .................. | 5:26 A. M. | 4:16 A. M. |
| Madison ..................... | 5:55 A. M. | 4:46 A. M. |
| Lees ........................ | 6:11 A. M. | 5:02 A. M. |
| Ellaville ................... | 6:25 A. M. | 5:17 A. M. |
| Falmouth .................... | 6:34 A. M. | 5:25 A. M. |
| Live Oak .................... | 6:55 A. M. | 5:47 A. M. |
| Houston ..................... | 7:25 A. M. | 5:59 A. M. |
| Welbourn .................... | 7:36 A. M. | 6:10 A. M. |
| Ogden ....................... | 7:47 A. M. | 6:22 A. M. |
| Lake City ................... | 8:00 A. M. | 6:33 A. M. |

State v. L. & N. and S. A. .L. Ry. Co.—Statement of Case.

| | | |
|---|---|---|
| Watertown | 8:10 A. M. | 6:43 A. M. |
| Mt. Carrie | 8:25 A. M. | 6:54 A. M. |
| Olustee | 8:37 A. M. | 7:02 A. M. |
| Sanderson | 9:13 A. M. | 7:22 A. M. |
| Glen St. Mary | 9:29 A. M. | 7:38 A. M. |
| McClenny | 9:36 A. M. | 7:43 A. M. |
| Baldwin | 10:05 A. M. | 8:05 A. M. |
| Millerton | 10:15 A. M. | 8:13 A. M. |
| Whitehouse | 10:22 A. M. | 8:20 A. M. |
| Marietta | 10:30 A. M. | 8:26 A. M. |
| West Jacksonville | 10:38 A. M. | 8:33 A. M. |
| Jacksonville | 10:50 A. M. | 8:45 A. M. |

That under the present schedule of the Seaboard Air Line Railway's train No. 76 which leaves River Junction Eastward bound at 12:05 P. M. for Jacksonville, and at that point makes close connection with North bound trains of the Seaboard Air Line Railway, Atlantic Coast Line Railroad and the Southern Railway, this train under the fastest schedule that can be made consistent with safety reaches McClenny at 6:25 P. M. Baldwin at 6:50 P. M. Millerton at 6:58 P. M. and Whitehouse at 7:05 P. M. and Jacksonville at 7:30 P. M. That there is a difference of eight and eight-tenths miles between Baldwin and McClenny. That it is a distance of 60 miles from Jacksonville to Lake City. That as will be seen by reference to the schedule of the Seaboard Air Line Railway's train No. 76, and the working out of the proposed schedule (which has been done by your respondent, the Seaboard Air Line Railway with the utmost care and caution with the view of making for the purpose of this hearing the said proposed schedule in so far as it is consistent with safety to the lives of its passengers and train crew) the proposed schedule would place its said train No. 79 at Baldwin

22—Vol. 62

bound Westward while its said train No. 76 would at the
same time reach McClenny the station on its line next
from Baldwin Westward going in an Easterly direction,
and with absolutely no station, trackage or facilities be-
tween the two stated points to arrange for their passage.
That under the fast schedule proposed to hold 79 at Bald-
win until train No. 76 reached that point would cause
train No. 79 to miss a majority of times if not invariably
its connection at Lake City with the Georgia Southern &
Florida Railway going North, and for which connection
this respondent handles a large number of passengers
daily.     That to hold train No. 76 at McClenny until train
No. 79 passed it there would likewise result in the miss-
ing of a North bound connection at Jacksonville by train
No. 76, which daily hauls a large number of passengers
from points on this respondent's line traveling Northward
via Jacksonville, which point is the quickest and most
convenient route for travelers going North and East.

That to comply with the proposed schedule as to trains
No. 78 and 79 after a most carefully working out of the
time table to meet such proposed schedule, this respondent,
the Seaboard Air Line Railway finds, as will be seen by
reference to such proposed schedule, heretofore set forth,
that train No. 78 going Eastward would be compelled to
leave River Junction at 1:00 A. M., while train No. 79
going Westward would reach Mt. Pleasant, the nearest
station next to and East of River Junction, at 1:00 A. M.,
leaving them, that is, train 78 and train 79, one at River
Junction and one at Mt. Pleasant ten miles apart going in
opposite directions with absolutely no station or facilities
to pass each other between those two points.

That the effect of the said Order upon the respondent,
the Seaboard Air Line Railway, will also require its fast
passenger train known as No. 66 from Tampa to Jack-

sonville to meet its said train No. 79 at Whitehouse, which place is a non-telegraph station, and wtih no facilities to give the train orders to either of said trains. That it is an impracticable proposition from a railroad standpoint to require passenger trains to pass at non-telegraph station; —it being the rule wherever possible to pass them by each other at telegraph stations,—that the operator can be given a copy of the orders to the respective train crews and see that the train first arriving at such station is held until the arrival of the train from the opposite direction, and thereby require them to pass each other with safety to the passengers and crew thereon.

That as will be seen by reference to the respective proposed schedules where the West bound schedule may be an improvment as to some points the East bound schedule is at such point more inconvenient than at present. That it will also be seen by reference to the schedules proposed that where some particular point on this respondent's line is benefited by the change proposed, yet, another point of equal importance receives a more inconvenient schedule.

That to make the proposed schedule for this respondent's train No. 79, and leave Jacksonville at the time proposed in said Order, this respondent cannot serve its patrons, and place its train in River Junction prior to 1:29 A. M. the following morning. While the respondent the Louisville & Nashville Railroad Company finds that it cannot place its train No. 4 in Pensacola and serve its patrons with safety unless such train leaves River Junction at 1:20 A. M. That it takes at least 20 minutes at River Junction to change engines and make transfers, which makes a discrepancy of 29 minutes in the through schedule.

5. That if the said Order 346 be put into effect, and the freight cars now carried on trains Nos. 1 and 4 are

eliminated from said trains, it will prevent the existance of a fast freight train on the said Louisville & Nashvlle Ralroad Company's line. The said fast freight is now carried in four or five cars, never exceeding five, which are sufficient to do the fast freight business over the said line. But the said business is not sufficient to warrant or justify the putting on of an exclusively fast freight train, and the expense of operating said train would much exceed the revenues which would be derived therefrom.

The delivery of fast freight by the Seaboard Air Line at Quincy and River Junction, will be entirely prevented by the discontinuance of the freight cars attached to train No. 79 of the said Seaboard Air Line Railway, and as hereinbefore set forth, with reference to the Louisville Railroad company, the expenses of conducting a distinctive and exclusively fast freight train will be prohibitive of the operation of such train, for the reasons hereinbefore given.

That a large amount of through freight, requiring rapid transportation, from Eastern points, is brought to Jacksonville by the Clyde Line, and carried over the Seaboard Air Line Railway and the Louisville & Nashville Railroad Company's railroad, from Jacksonville to Pensacola, and to points between said cities, and through Pensacola to Mobile and New Orleans, and if the said proposed schedule be made effective, the said freight cannot be carried as fast freight, but must be carried upon local freight trains, and thereby the time of delivery increased by several days. Not only thus will the consignees be greatly inconvenienced because of the increase of the time required for transportation, but much of said freight must be transported rapidly, in order that it may reach its destination before perishing, and in time for market.

Conversely, though, fast freights are now carried upon the said trains Nos. 1 and 4, from Pensacola to Jackson-

ville, and to points between said cities, such freights consisting of packing house products from Fort Worth, Texas, and Bananas from Mobile, and other products from points West of Pensacola. Much of such freights passes through Pensacola over the lines hereinbefore mentioned, to Jacksonville, and thence Northward and Southward. They require quick transportation, and if speed cannot be furnished over the lines of the respondents hereto, the said through trade will be diverted to other railroad lines.

The Louisville & Nashville Railroad Company has also conducted, by use of freight cars on its mixed trains Nos. 1 and 4, the business of carrying package freights to various points on its line aforesaid, in which business packages from Pensacola are carried to such points for distribution at such points, and thus reach the consignees within a day or a fraction of a day, after leaving Pensacola. If the said packages were carried by local freights, they would require for transportation several days longer than is required for transportation on the trains aforesaid.

The said Seaboard Air Line Railway carried, upon its train No. 79, freight cars for the delivery of package freight at Quincy and River Junction, from which latter point the said freight is conveyed to Apalachicola and intermediate stations and Port St. Joe, by which arrangement the said packages are delivered within twenty-four hours from the time of leaving Jacksonville. If the said rapid packages delivery be discontinued, the time of delivery of said package to the consignees thereof will be postponed for several days. The said business is of considerable amount and of large practical value to the citizens of the points mentioned.

That the respondents are informed and believes that the fast freight service made possible by the said mixed

trains is the fastest freight service in the South, and enables these respondents to compete with and gain trade from other lines of railroad, which would acquire and hold the said trade if the said fast freight trains were abolished.

That it would be impracticable, if the fast freight trains were made longer, by including more cars therein, to make the same time as is now made by the said mixed trains, in which the number of freight cars is rarely exceeding five.

6. That the average time required by Order No. 346 for the running of trains Nos. 1 and 4 on the Louisville & Nashville Railroad Company's line, and Nos. 78 and 79 on the Seaboard Air Line Railway's line, is about twenty-seven miles an hour. This is practically the rate of speed now used by trains Nos. 2 and 3 on the line of the former railroad company, and by trains Nos. 76 and 77 on the line of the latter railway, between Pensacola and Jacksonville; that the said trains 2, 3, 76 and 77, do not stop at, and thereby accommodate the inhabitants of, several points on the said lines at which the mixed trains now operated upon the said lines stop, and if the said trains Nos. 1, 4, 78 and 79 become exclusive passenger trains, they will still be required to serve the same points as the said mixed trains now serve, and thereby would be required to stop at many more places than the said trains Nos. 2, 3, 76 and 77. The points at which additional stops would be required on the Louisville & Nashville Railroad Company's line are, Inwood, Valle, Bearhead, Claroy, Harold, Gait City, Harp, Behemia, and Escambia, and the additional stops which would be required on the Seaboard Air Line Railway will be *Drake, Woodstock, Champagne, Braswell, Jamison, Ocklocknee and Lawrence Switch, and also (though shown on the proposed schedule) Ogden and Mt. Carrie, stops at some of which points have been ordered*

*by relators,* and these respondents aver that it would be impracticable to maintain the said schedule fixed' by the said Order No. 346, and make the said additional stops.

7. These respondents were present at the hearing mentioned in the alternative writ, before the Railroad Commissioners of the State of Florida, and were able to ascertain, from the expressions of the said Commissioners, only two reasons, why the said new schedule should be made, to-wit: that it would accommodate through passengers traveling between Pensacola and Jacksonville, and thus stimulate such travel, and, that it would enable persons going upon said lines to Jacksonville, by train No. 1 of the Louisville & Nashville Railroad Company, and by train No. 78 of the Seaboard Air Line Railway, to reach Jacksonville in time to make the south bound connection with the Florida East Coast Railway.

These respondents aver that the through passenger travel from Pensacola to Jacksonville and from Jacksonville to Pensacola, and from points through Jacksonville to Pensacola, is but a very small percentage of the passenger travel upon the lines of railway of these respondents between the said two mentioned points; that the Louisville & Nashville Railroad Company, respondent, has not heretofore kept its record in such shape as to show the number of through passengers between said points separate and apart from the way passengers, and being aware of that fact asked the Florida Railroad Commissioners, Relators, for permission to postpone the taking effect of the order for thirty days, so that it might ascertain the relative proportions of said through and way passengers, as a basis for the action of the commissioners, but that the said request was refused. Nevertheless, the said respondent has, since the making of the said order, taken steps to ascertain the number of passengers from Pensa-

cola, and from points beyond Pensacola, passing over its
line to the Seaboard Air Line Railway at River Junction,
and the reverse, although it has not been able to ascertain
the number of passengers passing over its line going
through Pensacola to Jacksonville, or from points beyond
Jacksonville to Pensacola, or beyond. It has also ascer-
tained the number of passengers from stations on the Pen-
sacola & Atlantic Division of its line to points upon said
division and to points on the Seaboard Air Line Railway
and from points on the Seaboard Air Line Railway to
points on the said Pensacola & Atlantic Division. This
information has been gained accurately, by taking account
of all tickets and passengers upon its trains Nos. 1 and 4
for seven days in the month of October, instant. The re-
sult of such investigation is, as the said respondent avers,
for the said seven days (excluding train No. 1 October
14th, which had not reported when the tabulation of said
date was made), that the ratio of passengers going
through from Pensacola, and points beyond Pensacola,
over the Pensacola & Atlantic Division of the said respond-
ent's line to River Junction, and to points on the Seaboard
Air Line Railway, to the number of way passengers going
from point to point on the said Pensacola & Atlantic
Division, or from points on the said division to points on
the Seaboard Air Line Railway and the reverse is as $2\frac{1}{2}$
to 100, that is to say, only about $2\frac{1}{2}$ per cent.

The number of passengers going through from Pensa-
cola, and points beyond Pensacola, over the said Pensa-
cola & Atlantic Division of the said respondent's line to
River Junction, and to points on the Seaboard Air Line
Railway, and the reverse, during the said seven days, was
151, and the number of way passengers going from point
to point on the said Pensacola & Atlantic Division, or
from points on the said Division to points on the Sea-

board Air Line Railway, and the reverse, was, during the said seven days 4216.

The ratio of the passengers going through from Pensacola, and points beyond Pensacola, over the Seaboard Air Line Railway to River Junction, and to points on the Louisville & Nashville Railroad, and the reverse, to the number of way passengers going from point to point on the Seaboard Air Line Railway, or from points on the said line to points on the Louisville & Nashville Railroad, and the reverse, has been, during the past 12 months, prior to October 1, 1911, as $8\frac{1}{2}$ to 100, that is to say, only about $8\frac{1}{2}$ per cent; that the number of passengers constituting the former class during the said months was 9410, and the number of passengers constituting the latter class during the said months was 112099. That of the 9410 through passengers 3235 were from points beyond Pensacola to Jacksonville and to reverse.

That these respondents admit that by having train No. 78 of the Seaboard Air Line Railway reach Jacksonville at 8:45 A. M., as it would under the said proposed schedule, the passengers by said train would be enabled to connect with the south-bound morning Florida East Coast Railway's train, whereas, under the present schedule, the said pasengers have to remain in Jacksonville from 10:50 A. M. until 12:15 P. M. These respondents however, aver that any convenience to the said passengers desiring to take the said south-bound train of the Florida East Coast Railway, is more than counterbalanced by the inconvenience to the through passengers arriving by train No. 4 of the Louisville & Nashville Railroad Company and to those departing by train No. 1 of the said company. By the said new schedule, passengers arriving by train No. 4 of the Louisville & Nashville Railroad Company, will reach Pensacola at 7:30 A. M., and be required to lie over for

four hours before taking the 11:30 train northward; and passengers arriving in Pensacola by the present train from the North at 4:10 P. M., will be required to lie over from that time until 7:00 P. M., whereas, by the present schedule, through passengers by the former train wait at Pensacola only fifteen minutes, and by the latter train, only one hour and five minutes.

8.   That the Louisville & Nashville Railroad Company has operated and managed its roads lying in the State of Florida, including the line between Pensacola and River Junction, with the utmost economy, consistent with the safety and dispatch of its passengers, and with the safe and prompt handling of its freights; that it has purchased supplies and equipments of the class and character required, as cheaply as it could get them; that its employes are paid as low wages as they would be employed at, taking into consideration their efficiency and ability to handle the trains of the said Louisville & Nashville Ralroad Company, with dispatch and safety; that all expenditures made in connection with and upon the said lines of railroad have been made as cheaply as possible; yet, that by and from the operation of the said road, conducted in the best manner known to the respondent, and as it believes, in the most economical manner possible, the said respondent has not been able by the operation of its said lines in Florida, to receive from its business on said roads, and thereby to realize, a sum sufficient to pay its operating expenses, and interest exceeding 3 per cent. upon the cost of reproduction of said road; that money cannot be borrowed in the State of Florida, for ordinary purposes for use in industrial enterprises, at less than from 7 per cent. to 8 per cent. and for use in large enterprises, like the construction and improvement of railroads, for less than 5 per cent. to 6 per cent. and that the profits ordinarily made

by industrial enterprises in Florida usually exceed 8 per cent; that the legal rate of interest in the State of Florida allowed upon judgments and decrees and upon contracts where no rate is stipulated thereon, is 8 per cent; and that if the said schedule directed by Order No. 346 be put into operation, and the said freight cars eliminated from trains Nos. 1 and 4, the cost of operating under said schedule, and the loss of the fast freight business, or the cost of operating a special fast freight train, would reduce the net receipts of the said respondent from the operation of its said lines, and would render it still more unable to realize from said operation sufficient to pay the cost of operation of said lines, and any interest exceeding 3 per cent. upon the cost of reproduction of the same.

And the said respondent says that the putting into effect of the said Order 346 producing the said result, would be a deprivation by the State of Florida of the respondent of its property without due process of law, and in violation of the provisions of the fourteenth amendment of the Constitution of the United States, and would deny to the said respondent the equal protection of the law, and thereby violate the provisions of the said constitutional amendment.

9. That the passengers who travel upon trains Nos. 1 and 4 of said respondent, between Pensacola and River Junction, are in part passengers who are destined to and come and go from and to points out of the State of Florida, to and from points in the State of Florida; that the freight cars carried on said trains are, in by far the largest part, through cars between points in Florida and between points outside of Florida, and laden with through freight between said points; that said through passengers and freight traffic by said trains Nos. 1 and 4 is Interstate Commerce; and that the regulation of the schedules of

said trains by the Relators, in the manner and to the extent which would be effected by the operation of said order, and the prohibition of pulling fast freight cars upon the said trains, as hereinbefore set forth, would constitute an unnecessary, arbitrary and unreasonable interference with, delay of and injury to Interstate Commerce, and be in violation of the exclusive power conferred upon Congress by the Constitution of the United States; and especially by Section 8 of Article 1 of said constitution.

10.  That the Seaboard Air Line Railway Company has operated and managed its roads lying in the State of Florida, including the line between Jacksonville and Pensacola, with the utmost economy, consistent with the safety and despatch of its passengers, and with the safe and prompt handling of its freights; that it has purchased supplies and equipment of the class and character required, as cheaply as it could get them; that its employes are paid as low wages as they would be employed at, taking into consideration their efficiency and ability to handle the trains of the said railway, with despatch and safety; that all expenditures made in connection with and upon the said lines of railroad have been made as cheaply as possible; yet, that by and from the operation of the said road, conducted in the best manner known to this respondent, and as it believes, in the most economical manner possible, the said respondent has not been able, by the operation of its said lines, in Florida, to receive from its business on said roads, and thereby to realize, a sum sufficient to pay its operating expenses, and over a reasonable rate of interest upon the cost of reproduction of the said road; and that if the said schedule directed by Order No. 346 were put into operation, and the said freight cars eliminated from trains Nos. 78 and 79, the cost of operating under said schedule, and the loss arising from the loss of the

fast freight business, or the cost of operating a special fast freight train, would reduce the net receipts of the said respondent from the operation of its said lines, and would render it still more unable to realize from said operation sufficient to pay the cost of operation of said lines, and any interest upon the cost of reproduction of the same.

And the said respondent says that the putting into effect of the said order No. 346, producing the said result, would be a deprivation by the State of Florida of the said respondent of its property, without due process of law, and in violation of the provisions of the fourteenth amendment of the Constitution of the United States, and would deny to the said respondent the equal protection of the law, and thereby violate the provisions of the said constitutional amendment.

11. That the passengers who travel upon the trains 78 and 79 of the said respondent, between Jacksonville and River Junction, are in part passengers who are destined to and come and go from and to points out of the State of Florida to and from points in the State of Florida; that the freight cars carried on said trains are, in by far the largest part, through cars between points in Florida and points outside of Florida, and laden with through freight between said points; that the said passenger and freight traffic is Interstate Commerce, and that the regulation of the schedules of said trains by the Relators, in the manner and to the extent which would be effected by said Order, and the prohibition of carrying said freight cars on said trains, as hereinbefore set forth, would constitute an unnecessary, arbitrary and unreasonable interference with, delay of and injury to Interstate Commerce, and would be in violation of the exclusive power conferred upon Congress by the Constitution of the United.

States, and especially by Section 8 of Article 1, of the said Constitution.

12.   These respondents aver that they are informed by the Railroad Commissioners of the State of Florida, and believe, that the Order No. 346 was based upon no specific complaint filed with the said Commissioners, of the now existing schedule, except one filed about a year prior to the order of the said Commissioners to these respondents to show cause why the said schedule should not be changed, but that the said order was based upon general complaints, heard by the individual Railroad Commissioners while traveling on said trains.

13.   That the number of passengers shown in paragraph 7 to have traveled on the line of the Louisville & Nashville Railroad Company between Pensacola and River Junction during the week mentioned in said paragraph was approximately the average number of passengers traveling per week over said line during the year next preceding said week.

That the passenger travel over the lines of the respondents between Jacksonville and Pensacola is not large, and that the respondents now operate on said lines between said points two fast trains, one each way daily, which afford adequate facilities for fast travel for all passengers traveling over and through either of said points to the other, and for all passengers traveling on said lines requiring fast travel.

That the inconvenience to the way passengers on the lines of the respondents and the injury to them and to the communities and to the respondents as hereinbefore set forth, will result from the change of schedule proposed by Order 346, unless respondents put into operation local trains on the said lines with schedules the same, or substantially the same, as those now in force as to train one

and four on the Louisville & Nashville Railroad Company's line and 78 and 79 on the Seaboard Air Line Railway's line. That the addition of said local trains would not add to the number of passengers traveling on said lines, but would transfer to said additional trains by far the largest part of the passenger travel now using trains one and four and 78 and 79. That the addition of said trains would double the large expense of the passenger service now rendered by respondents to the public by the said trains one and four and 78 and 79, and thus still further lessen the income of the respondents and render them more unable to earn from the operation of their lines in Florida operating expenses and interest exceeding 3 per cent on the cost of reproduction on their lines in Florida, and that the putting into effect of Order No. 346 producing such result would deprive respondents of their property without due process of law and the equal protection of the laws, and thus violate the 14th, Amendment of the Constitution of the United States.

The respondents aver that the said order No. 346 is so arbitrary and unreasonable, as hereinbefore set forth, and so interferes with the management of the respondents of their said lines of railroad, that if put into effect it would deprive respondents of the protection of the 14th amendment to the Constitution of the United States, in that it would take their property without due process of law, and would deprive them of the equal protection of the laws.

W. A. Blount,

Attorney for the Louisville & Nashville Railroad Company.

W. J. Oven,

Attorney for the Seaboard Air Line Railway."

To this return the following demurrer was interposed:

"The relators say that the amended return of the respondents to the alternative writ is bad in substance.

And the relators further say that each of the paragraphs of the said amended return, numbered 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, is bad in substance. ·

And the relators further say that each of the subdivisions a, b, c, d, e, of paragraph 3 of the amended return is bad in substance.

And for cause of demurrer the relators show:

1.   The order of the Railroad Commissioners set out in the alternative writ is presumed to be reasonable and just and the said amended return does not set up facts suffcient to rebut this presumption.

2.   The said amended return does not set up facts sufficient to show that the said order is either unreasonable, unnecessary, arbitrary or impracticable as alleged in the return.

3.   The amended return is in the nature of a plea in confession and avoidance and as such it fails to comply with the rule in mandamus proeedings requiring great strictness in setting up matter in confession and avoidance.

4.   Paragraphs numbered 2 to 7 inclusive only questions of the expediency of the order of the Railroad Commissioners set up in the alternative writ and, therefore, refer to matters addressed to the discretion and judgment of the Railroad Commissioners.

5.   The matters set up in the said paragraphs 2 to 7 inclusive are not sufficiently shown to be matters subject to judicial review.

6.   Even if the matters set up in the said paragraphs 2 to 7 inclusive are subject to judicial review, under any circumstances they are not subject to such review in the absence of a showing that application has been first made

to the Railroad Commissioners for proper action upon the matters therein set forth.

7. The facts alleged in the 8th, paragraph of the said return are not such as to show that the order set up in the alternative writ would amount to deprivation of the respondent, the Louisville & Nashville Railroad Company, of its property without due process of law.

8. The facts set up in the 9th, paragraph of the said return are not sufficient to show that the order of the Railroad Commissioners would constitute any interference with or delay of or injury to Interstate Commerce.

9. The facts set up in the 9th, paragraph of the said return are not sufficient to show that the order of the Railroad Commissioners in question amounts to a regulation of Interstate Commerce.

10. The facts set out in the 10th, paragraph of the said return are not sufficient to show that the said order of the Railroad Commissioners would have the effect of depriving the respondent, the Seaboard Air Line Railway, of its property without due process of law.

11. The facts set up in the 11th, paragraph of the said return are not sufficient to show that the order in question would constitute any interference with, delay of or injury to Interstate Commerce.

12. The facts set out in the 11th, paragraph of the said return are not sufficient to show that the order in question amounts to a regulation of Interstate Commerce.

13. The allegations of the 8, 9, 10 and 11th, paragraphs of the said returns are not sufficiently specific and do not comply with the rule in mandamus requiring great strictness in setting up matters in confession and avoidance.

14. The order in question undertakes to enforce the obligations of the respondent companies to provide

adequate facilities for the proper operation of their roads and the proper accommodation of their patrons and is, therefore, not violative of the 14th, Amendment to the Constitution of the United States and therefore the effect of the said order can not be to deprive said respondents of property without due process of law or to deny the equal protection of the law.

15. The 12th, paragraph of the said return is bad because the relators have the right to act upon their own initiative.

F. M. Hudson,<br>Attorney for Relators."

F. M. Hudson, for Relators;

W. A. Blount and W. J. Oven, for Respondents.

WHITFIELD, C. J.—The purpose of this proceeding is to enforce the order of the Railroad Commissioners set out in the statement requiring the respondents to cease carrying freight cars in certain designated trains between Jacksonville and Pensacola, points within this State, and to observe a prescribed schedule in the operation of such trains.

It is not contended that the order the relators seek to have enforced is illegal on its face. The questions presented are whether the averments of the return to the alternative writ that are admitted by the demurrer show that the enforcement of the order as made (1) will deny to the respondents in their property rights due process and equal protection of the laws; (2) will unlawfully burden or regulate interstate commerce; (3) will be unreasonable, unnecessary, arbitrary and impracticable with refer-

ence to the respondents and the public who are affected
by the order.

The demurrer admits as true all well pleaded averments
of fact, and also all fair and pertinent inferences or con-
clusions of fact, contained in the return, that are not in-
consistent with or repugnant to the accompanying specific
detailed averments of facts and circumstances.  But the
demurrer does not admit conclusions of law stated in the
return.  If the facts stated in the return and admitted
by the demurrer do not amount to a defense to the writ,
the demurrer is well taken.  But if the detailed specific
facts and circumstances that are well pleaded, justify the
conclusions of fact and of law that are asserted, and con-
stitute a defense to the alternative writ, the demurrer
should be overruled.

Railroad companies are by the State permitted to use
franchises and to render the public service of common
carriers, primarily to meet the reasonable requirements of
transportation for the public.  For such service the car-
rier is under the law entitled to only a reasonable com-
pensation to be ascertained by a proper consideration of
all the facts and circumstances affecting the service, both
as to the carrier and as to the public severably and col-
lectively who are to be served.  Property, labor and man-
agement are under the law devoted to the public service
voluntarily engaged in, subject to the burden of lawful
governmental regulation in the interest of the public to be
served, as well as subject to the requirement of law that
reasonably adequate facilities shall be afforded, and that
only reasonable compensation is allowed.  Remuneration
for the property and labor used depends upon the result of
a reasonable compensation for service rendered.  The
amount and reasonableness of the return for property
used in the service resulting from compensation for service

rendered depends upon circumstances in the absence of
valid legislation on the subject.  If a governmental regu-
lation does not unreasonably discriminate against a car-
rier there is no denial of the equal protection of the laws.
If a regulation is not so unreasonable, unjust and arbi-
trary as to prevent the carrier from receiving a just com-
pensation for service rendered, there is no deprivation of
property without due process of law.  If a regulation does
not directly and materially burden Interstate Commerce
or conflict with regulations prescribed or lawfully au-
thorized by Congress, the interstate commerce clause of
the Federal Constitution is not violated.  If a regula-
tion within the authority conferred in not in its terms
or in its operation unjust and unreasonable as to the
carrier or as to the persons, localities or commodities
affected by it, the authority given by the statute to the
Railroad Commissioners to make just and reasonable
rules and regulations as to intrastate transportation is
not exceeded or violated.

The Railroad Commissioners are statutory officers au-
thorized by the constitution.  Their power and duties are
only such as are expressly or impliedly conferred by
statutes.  When acting within the authority conferred
upon them, a wide discretion is accorded to the Railroad
Commissioners; and an alleged abuse of discretion by
them must be affirmatively and sufficiently shown by ad-
missions or proofs before the courts will interfere.  Valid
regulations of the Railroad Commission should be made
effective as contemplated by the constitution and statutes.
The Railroad Commission is a branch of the State Govern-
mental authority, and the statute expressly provides that
rates, rules and regulations made by them shall be
regarded as *prima facie* reasonable and just.  If the ad-
missions or proofs in judicial proceedings clearly show a

regulation of the Railroad Commissioners to be a viola-
tion of law or an abuse of discretion that in effect confis-
cates property, or unreasonably and illegally imposes bur-
dens affecting property rights, it operates as or amounts
to a deprivation by the State of private property rights
without due process of law or to a denial by the State of
the equal protection of the laws, and the courts will afford
appropriate relief. Likewise if a regulation is shown by
admissions or proofs to be an unlawful burden upon Inter-
state ·Commerce or to be a violation of any provision of
law, the courts will, in appropriate proceedings, interfere
and enforce the law.

A railroad common carrier may, in addition to the
facilities and accommodations already furnished, be re-
quired to render a particular service that it is essentially
the duty of the carrier to do for the reasonable con-
venience of its patrons among the public, and to meet the
reasonable requirements of the public service undertaken.
Even though such a particular duty if enforced would be
in itself unremunerative and burdensome, such a result
would be an incident to the service voluntarily under-
taken, in consideration of the franchises permitted·to be
used for the public good, and the property rights of the
carrier would not thereby be unlawfully invaded, if the
particular service is reasonably necessary for the public
convenience, and the burden to the carrier has some fair
relation to the benefits accruing to the public, and the bur-
den of the particular service, considered with reference to
the entire business of the carrier, does not in reality
amount to a denial to the carrier of a reasonable compen-
sation for the service rendered by it as an entirety. See
State *ex rel.* Railroad Commissioners v. Florida East
Coast R. Co. 57 Fla. 522, 49 South. Rep 43, North Carolina
Corporation Commission v. Atlantic Coast Line R. Co. 137

N. C. 1, 49 S. E. Rep. 191; affirmed in 206 U. S. 1, 27 Sup. Ct. Rep. 585 11, Ann. Cas. 398.

Where it appears that a particular service is a duty vitally necessary to the public, and its performance is essential in adequately rendering a general public service as common carrier, the fact that the performance of the particular duty will be unremunerative will not in view of the nature of the duty to the public excuse non-performance. See New York v. Barker, 179 U. S. 287, 21 Sup. Ct. Rep. 124; Missouri Pac. Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. Rep. 330. And if the performance of a particular useful, but non-essential duty will as a part of a general public service contribute to the public convenience, the fact that the particular service must be rendered at a loss, does not, in view of the nature of the duty required, excuse non-performance; but the loss occasioned by the performance of the particular duty may be considered in determining the reasonableness of the order requiring the particular service to be rendered. Atlantic Coast Line Railroad Company v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. Rep. 585.

The general and special powers conferred by the statutes of the State upon the Railroad Commissioners are ample to authorize them to make and enforce just and reasonable orders, rules and regulations for the furnishing by the respondents of reasonably adequate facilities and accommodations to the traveling public by the operation of the two passenger trains mentioned in the order, separate from freight cars, and for establishing schedules to be observed in operating such passenger trains between points within this State; and all such orders, rules and regulations when made are by the statute declared to be *prima facie* reasonable and just. If such particular regulations are reasonably useful and expedient for the just

requirements of the public service being performed by the respondents, thereby making it a duty of the carrier to render the service, the regulations if not illegal may be énforced even though the service required is not remunerative, unless it is made to clearly appear that the particular regulations are so unreasonable and arbitrary that their enforcement will operate to deny to the respondents a reasonable compensation for the entire service rendered by the carrier.

In determining whether a rate, rule, regulation or order of the Railroad Commission upon a subject withîn its authority is so unreasonable and arbitrary as to be illegal and unenforcable. the court, in deference to the governmental functions conferred by law upon the Commissioners, will not only require the *prima facies* of reasonableness impressed by the statute upon the rate, rule, regulation or order to be overcome by admission or proofs, but will require the admissions or proofs of facts tending to show unreasonableness to be clear and convincing, every reasonable doubt being yielded in favor of the rate, rule, regulation or order.

The reasonableness of a rate, rule, regulation or order of the Railroad Commissioners is to be determined by a consideration of the rights of all parties directly and materially affected by the rate, rule, regulation or order. This involves a consideration of all the facts and circumstances by such appropriate processes and standards of reasoning and computation as are afforded by law or by common experience and the dictates of right and justice.

In determining whether the burden of a particular regulation enforced by State authority is confiscatory and unlawful because it prevents a railroad company from receiving a reasonable compensation for the service rendered taken as an entirety, the fair actual value of all the

property and labor and management rightly used in rendering the service should be considered. The cost of reproduction of the property may be an element to be considered in ascertaining the real value of the property used, but it is not the value that is to be arbitrarily considered in determining what is a reasonable compensation for the service rendered as a whole by a common carrier. Wilcox v. Consolidated Gas Company, 212 U. S. 19, 192 Sup. Ct. Rep. 29. Where the same property, labor and management are used at the same time by a common carrier in interstate and intrastate commerce, the value of the property and labor and management used should be properly apportioned in determining the reasonableness of the compensation for service rendered by the carrier in the intrastate business taken separately and as an entirety, or in connection with the interstate business concurrently done. See State ex. rel. Atty. Gen. v. Atlantic Coast Line R. Co., 48 Fla. 146, 37 South Rep. 657; State ex. rel. S. A. L. Ry., 48 Fla. 129, 37 South. Rep. 314.

The averments of the return as to the enforcement of the order being a denial of due process and equal protection of the laws are as follows:

"That the Louisville & Nashville Railroad Company has operated and managed its roads lying in the State of Florida, including the line between Pensacola and River Junction, with the utmost economy, consistent with the safety and dispatch of its passengers, and with the safe and prompt handling of its freights; that it has purchased supplies and equipments of the class and character required, as cheaply as it could get them; that its employes are paid as low wages as they would be employed at, taking into consideration their efficiency and ability to handle the trains of the said Louisville & Nashville Railroad Company, with despatch and safety; that

all expenditures made in connection with and upon the said lines of railroad have been made as cheaply as possible; yet, that by and from the operation of the said road, conducted in the best manner known to the respondent, and as it believes, in the most economical manner possible, the said respondent has not been able, by the operation of its said lines in Florida, to receive from its business on said roads, and thereby to realize a sum sufficient to pay its operating expenses, and interest exceeding 3% upon the cost of reproduction of said road; that money cannot be borrowed in the State of Florida, for ordinary purposes for use in industrial enterprises, at less than from 7% to 8%, and for use in large enterprises, like the construction and improvement of railroads, for less than 5% to 6%; and that the profits ordinarily made by industrial enterprises in Florida usually exceed 8%; that the legal rate of interest in the State of Florida allowed upon judgments and decrees and upon contracts where no rate is stipulated thereon, is 8%; and that if the said schedule directed by Order No. 346 be put into operation, and the said freight cars eliminated from trains Nos. 1 and 4, the cost of operating under said schedule, and the loss of the fast freight business, or the cost of operating a special fast freight train, would reduce the net receipts of the said respondent from the operation of its said lines, and would render it still more unable to realize from said operation sufficient to pay the cost of operation of said lines, and any interest exceeding 3% upon the cost of reproduction of the same.

And the said respondent says that the putting into effect of the said Order 346, producing the said result, would be a deprivation by the State of Florida of the respondent of its property without due process of law, and in violation of the provisions of the Fourteenth

Amendment of the Constitution of the United States, and would deny to the said respondent the equal protection of the law, and thereby violate the provisions of the said constitutional amendment.

That the Seaboard Air Line Railway Company has operated and managed its roads lying in the State of Florida, including the line between Jacksonville and Pensacola, with the utmost economy, consistent with the safety and despatch of its passengers, and with the safe and prompt handling of its freights; that it has purchased supplies and equipment of the class and character required, as cheaply as it could get them; that its employes are paid as low wages as they would be employed at, taking into consideration their efficiency and ability to handle the trains of the said railway, with despatch and safety; that all expenditures made in connection with and upon the said lines of railroad have been made as cheaply as possible; yet, that by and from the operation of the said road, conducted in the best manner known to this respondent, and as it believes, in the most economical manner possible, the said respondent has not been able, by the operation of its said lines, in Florida, to receive from its business on said roads, and thereby to realize a sum sufficient to pay its operating expenses, and over a reasonable rate of interest upon the cost of reproduction of the said road; and that if the said schedule directed by Order No. 346 were put into operation, and the said freight cars eliminated from trains Nos. 78 and 79, the cost of operating under said schedule, and the loss arising from the loss of the fast freight business, or the cost of operating a special fast freight train, would reduce the net receipts of the said respondent from the operation of its said lines, and would render it still more unable to realize from said operation sufficient to pay the cost of operation

of said lines, and any interest upon the cost of reproduc-
tion of the same.

And the said respondent says that the putting into
effect of the said Order No. 346, producing the said result,
would be a deprivation by the State of Florida of the said
respondent of its property, without due process of law,
and in violation of the provisions of the Fourteenth
Amendment of the Constitution of the United States,
and would deny to the said respondent the equal protec-
tiion of the law, and thereby violate the provisions of the
said constitutional amendment."

These averments considered separately or in connec-
tion with other averments do not show that the enforce-
ment of the order will illegally deprive the respondents of
property rights without due process or equal protection
of law, because the regulation requires the performance
of a duty of respondents, useful and expedient if not nec-
essary to the public good, and it does not appear that the
regulation will deprive the respondents of a reasonable
compensation for the entire service that is rendered by
the carrier. There is besides no averment that the con-
clusion of illegality asserted will result if the real value
of the property and labor used in rendering the entire
intrastate service is considered in ascertaining whether
the regulation will deny to the respondent a reasonable
compensation for the intrastate service considered as an
entirety, or that the proportion of the same property and
labor that is also used for interstate commerce has not
been included in the estimate upon which the conclusion
of confiscation is asserted. No such unjust discrimination
or unfair classification of persons affected by the regu-
lation appears from the facts alleged as will justify the
asserted conclusion that the respondents will in substan-

tial reality be denied the equal protection of the laws if the order is enforced.

The State may enforce regulations to be observed by a railroad common carrier in intrastate transportation for the safety and convenience of the public who are affected by the regulation even though interstate commerce is thereby indirectly and incidentally affected, without violating the interstate clause of the Federal Constitution, where such regulations are in aid of, or do not in fact impose substantial burden upon lawful interstate commerce or do not conflict with regulations of the subject that are legally prescribed or authorized by Congress. State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 South. Rep. 969, 32 L. R. A. (N. S.) 639; 7 Ann. Cas 5, and notes; Gladson v. State of Minnesota, 166 U. S. 427, 17 Sup. Ct. Rep. 627; Lake Shore & M. S. Ry. Co. v. State of Ohio, 173 U. S. 285, 19 Sup. Ct. Rep. 465; Chicago, R. I. & Pac. Ry. Co. v. Arkansas, 219 U. S. 453, 31 Sup. Ct. Rep. 275; Missouri Pac. Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. Rep. 330.

The averments of the return as to the order being an unlawful regulation of interstate commerce are as follows:

"That the passengers who travel upon trains Nos. 1 and 4 of said respondent, between Pensacola and River Junction, are in part passengers who are destined to and come and go from and to points out of the State of Florida, to and from points in the State of Florida; that the freight cars carried on said trains are, in by far the largest part, through cars between points in Florida and between points outside of Florida, and laden with through freight between said points; that said through passenger and freight traffic by said trains Nos. 1 and 4 is Interstate Commerce; and that the regulation of the schedules

of said trains by the Relators, in the manner and to the extent which would be effected by the operation of said order, and the prohibition of pulling fast freight cars upon the said trains, as hereinbefore set forth, would constitute an unnecessary, arbitrary and unreasonable interference with, delay of and injury to Interstate Commerce, and be in violation of the exclusive power conferred upon Congress by the Constitution of the United States, and especially by Section 8 of Article 1 of said constitution."

"That the passengers who travel upon the trains 78 and 79 of the said respondent, between Jacksonville and River Junction, are in part passengers who are destined to and come and go from and to points out of the State of Florida to and from points in the State of Florida; that the freight cars carried on said trains are, in by far the largest part, through cars between points in Florida and points outside of Florida, and laden with through freight between said points; that the said passenger and freight traffic is Interstate Commerce, and that the regulation of the schedules of said trains by the relators, in the manner and to the extent which would be effected by said Order, and the prohibition of carrying said freight cars on said trains, as hereinbefore set forth, would constitute an unnecessary, arbitrary and unreasonable interference with, delay of and injury to Interstate Commerce, and would be in violation of the exclusive power conferred upon Congress by the Constitution of the United States, and especially by Section 8 of Article 1, of the said Constitution."

While upon the facts admitted by the demurrer the regulation if enforced may incidentally and to some appreciable extent effect interstate commerce, it is not clearly shown that any substaintial burden would thereby be imposed upon interstate commerce. Nor does it appear

that the regulation would conflict with any regulation of the subject by authority of Congress. The presumptions are in favor of the order, and the regulation may result in an aid to interstate commerce that is consistent with congressional regulations and best subserve the interests of the public and the carrier. Respondents are not forbidden to operate a separate fast freight train for interstate freight. Interstate passengers will be benefited by the order. The reasonable requirements of passengers should not be subordinated to freight.

The order requiring passenger trains instead of mixed passenger and freight trains to be operated is *prima facie* reasonable and just, it apparently would be a convenience to interstate passengers and to all others, and it does not clearly appear from the averments of the return admitted by the demurrer, that the enforcement of the order in this severable particular will deny to the respondents due process or equal protection of the laws, or unlawfully burden interstate commerce, or that such regulation will operate unreasonably or unjustly on the respondents so as to make it beyond the authority of the Commissioners to make and enforce. The expediency of, if not the necessity for, the regulation to subserve the public convenience is shown by the order. In so far as the order requires the operation of separate passenger trains it may be enforced by appropriate mandatory writ.

Where a governmental regulation is directly prescribed by valid legislative enactment its expediency and reasonableness, when no violation of organic law is involved, will not be inquired into by the courts, since the legislature and the judiciary are co-ordinate branches of the State government, and legislative action is subject only to the organic law and is reviewable by the courts only when the supreme law of the land is violated.

But action taken by an administrative officer or board must not only be in accordance with organic law, but it must conform to applicable valid statutes and must be reasonable in its operation.  Such administrative action is also subject to judicial review as to matters that are not concluded by the exercise of administrative discretion and action.  Even though, the law gives to administrative action the effect of *prima facie* reasonableness, the courts may inquire into the reasonableness of the action.  If in appropriate judicial proceedings it clearly appears that the administrative action complained of is an abuse of discretion and is not in fact reasonable, it will not be enforced, and it may be annulled or checked.  Administrative discretion and action involving matters of mere expediency not amounting to unreasonableness or illegality will in general not be interfered with by the courts.

It is the duty of the carrier to render a service that is reasonably adequate and of most convenience to the greatest number of the public affected by the service.

The Railroad Commissioners are authorized to make and enforce only reasonable and just rules and regulations for intrastate transportation.  In determining the reasonableness of a regulation authorized by the statute "for the establishing of such schedules for the arrival and departure of trains at depots as public comfort and convenience may require," the necessities and convenience of the public to be affected by the regulation should be considered as a whole and severally, regard being had for the number and reasonable requirements of patrons at different points on the line, and from connecting lines as well as the rights of the carrier.  See State *ex rel.* Railroad Com'rs. v. Florida East Coast R. Co., 58 Fla. 524, 50 South. Rep. 425.

It clearly appears from the averments and the fair

SUPREME COURT OF FLORIDA.

inferences of fact contained in the return and admitted by the demurrer that the enforcement of the schedule set out in the order will make the trains reach each terminus at such an early hour of the day as to result in great inconvenience to the large number of passengers on the line and from connecting lines who daily patronize these trains to and from the termini and points on the line some distance from each terminus, while it would add correspondingly little to the convenience of the limited number of through passengers and to those from the more central points on the line, besides the loss that would result to the carrier by a decrease of the number of passengers from and to points on the line nearer to each terminus, and the admittedly impracticability in important respects of the schedule prescribed.

The status of *prima facie* reasonableness given to the order by the statute and the presumptions in favor of the action of the Commissioners indulged in by the court are manifestly overcome by the facts and the fair inferences therefrom that are admitted by the demurrer. While the order indicates the expediency for a schedule more suitable than the present one in furnishing reasonably adequate facilities and accommodations to meet the just requirement of the patrons of the line, considered as a whole and by reasonable classifications, it is apparent from the admission of the demurrer that the schedule as prescribed in the order sought to be enforced, is not reasonable and just in its effect upon the carriers and the patrons. It thus clearly appears that the order in so far as it prescribes the particular schedule for the arrival and departure of the designated trains is an unjust and unreasonable regulation not authorized nor contemplated, but impliedly forbidden by the statute in expressly authorizing only just and reasonable regulations.

The power to make reasonable rules and regulations for establishing schedules does not contemplate that the Commissioners shall arbitrarily assume the actual control and management of the physical property of the carrier, so as to unlawfully deprive the carrier of its right to manage its own property; but such grant of power does contemplate that the Railroad Commissioners by making and enforcing just and reasonable rules and orders, shall supervise and regulate "the establishing" of proper schedules, as in all other matters affecting the service within the authority conferred by statute.

The Railroad Commissioners may perform their duties conferred by statute without awaiting a specific complaint to be made to them, therefore a motion of the relators is granted to strike the paragraph of the return numbered 12, averring in effect that no sufficient or appropriate specific complaint has been made to the Commissioners upon which to base their order.

The mandatory parts of the alternative writ being admittedly severable the demurrer to the return is sustained in so far as the return relates to the portion of the writ requiring the respondents to discontinue the hauling of freight cars on Louisville & Nashville trains No. 1 and No. 4, and on Seaboard Air Line trains No. 78 and No. 79, as stated in the writ; and the demurrer to the return is overruled in so far as the return relates to the portion of the writ requiring the respondents to observe the prescribed schedule in the operation of the mentioned trains.

SHACKLEFORD and COCKRELL, J. J., concur.

TAYLOR, HOCKER and PARKHILL, J. J., concur in the opinion.